**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|                              |     |                      |
|------------------------------|-----|----------------------|
| JAIME RODRIGUEZ,             | )   |                      |
|                              | )   |                      |
| Petitioner,                  | )   |                      |
|                              | )   |                      |
| - v. -                       | )   | 14 Civ. 4628 (CSH)   |
|                              | )   | 94 Cr. 313 (CSH)     |
| UNITED STATES OF AMERICA,    | )   |                      |
|                              | )   |                      |
| Respondent.                  | )   |                      |
|                              | )   |                      |

_____

|                              |     |                      |
|------------------------------|-----|----------------------|
| STEVEN CAMACHO,              | )   |                      |
|                              | )   |                      |
| Petitioner,                  | )   |                      |
|                              | )   |                      |
| - v. -                       | )   | 14 Civ. 4846 (CSH)   |
|                              | )   | 94 Cr. 313 (CSH)     |
| UNITED STATES OF AMERICA,    | )   |                      |
|                              | )   |                      |
| Respondent.                  | )   |                      |
|                              | )   |                      |

_____

## MEMORANDUM AND OPINION ON PETITIONS FOR HABEAS CORPUS

**HAIGHT, Senior District Judge:**

Jaime Rodriguez and Steven Camacho (collectively "Petitioners") are currently in federal custody following their conviction on criminal charges in this Court. They have filed timely petitions for habeas corpus relief pursuant to 28 U.S.C. § 2255. Respondent United States of America opposes the petitions. This opinion resolves them.

# I.  BACKGROUND

In May 1994, a grand jury in this District returned a 73-count indictment, 94 Cr. 313, charging 17 individuals, including Petitioners, with, among other crimes, participating in a racketeering enterprise called "C&C," in violation of 18 U.S.C. §§ 1961 and 1962(c).    As the complex multi-defendant case went forward, the ranks of defendants were thinned by individual guilty pleas and cooperation agreements.  The indictment was superseded repeatedly.

As described in the indictment, in the early 1990s C&C was a violent organization that sold its own brand of heroin in a several-block-square section of the Bronx, New York City, and also extorted "rent" from other drug dealers wishing to sell heroin in C&C's territory.  C&C employed a security force which patrolled the affected neighborhood, protected the organization's affiliated heroin dealers, and enforced the rules set by C&C's leaders and namesakes: George Calderon and Angel Padilla , a/k/a "Cuson." The present Petitioners, Steven Camacho and Jaime Rodriguez, were at the pertinent times young men residing in New York City, engaged in the drug-trafficking business, who obtained Calderon's permission to sell heroin in C&C's controlled territory, in exchange for a down payment and weekly rent payments.

In the spring of 1992, Calderon and Padilla had a falling out, which led to the murder of Calderon, arranged by Padilla.  C&C continued its organizational activities in the Bronx, during a time of understandable unrest.  In September 1992, Padilla was arrested by the NYPD and detained. While in prison, Padilla continued to receive payments from C&C.  The day-to-day operations of the organization were directed by others.  As noted, the grand jury's eventual indictment included Rodriguez and Camacho among the 17 C&C-involved defendants.

Ultimately the Court severed the government's case against Camacho and Rodriguez for trial

on specified counts. 939 F. Supp. 203 (S.D.N.Y. 1996). While the initial indictment charged Padilla and 16 other defendants with a broad range of criminal activities during the course of the C&C organization's existence, the government's superseding indictment against Camacho and Rodriguez focused upon events occurring on a Bronx street during the night of January 2, 1993. The indictment charged five counts against each Petitioner: conspiring to murder Hector Ocasio, a/k/a "Neno"; murdering Ocasio; murdering Gilberto Garcia, a/k/a "Tablon"; attempting to murder Luis Garcia (each of these four counts allegedly in aid of a violent drug-trafficking criminal enterprise called "C&C"); and using and carrying firearms during and in relation to the crimes charged in the first four counts. The first four counts alleged violations of 18 U.S.C. § 1959. The fifth count alleged violations of 18 U.S.C. §924(c). The government's theory, which it undertook to prove at trial, was that Ocasio, in charge of collecting C&C rent revenues and paying the C&C security force, had fallen out of favor with other C&C employees, and Camacho and Rodriguez participated in Ocasio's murder (and the concurrent shootings of others) in exchange for payment by C&C and in hopes of improving their own standing in the organization.

Trial commenced on June 3, 1996. On June 26, the jury returned a verdict convicting each Petitioner on each of these counts.[1] The jury indicated in its verdict form that it convicted the Petitioners on the specific charges of committing these crimes of violence to further and in aid of the C&C criminal enterprise.

This Court denied Petitioners' post-trial motions to set aside the verdict, to enter a judgment of acquittal, or to obtain a new trial. 1998 WL 472844 (S.D.N.Y. Aug. 10, 1998). Prior to

---

[1] The principal defendant in the original indictment, the head of the C&C enterprise, was convicted in a separate trial. The Second Circuit affirmed that conviction. *United States v. Padilla*, 203 F.3d 156 (2d Cir. 2000).

sentencing, Petitioners filed a second motion for a new trial, contending principally that a government trial witness, Gregory Cherry, had made out-of-court statements exculpatory of Petitioners. Petitioners sought judicial immunity for Cherry, which the government had denied, so that Cherry could provide that testimony. The Court denied that motion. 1999 WL 1084229 (S.D.N.Y. Dec. 1, 1999). The Court sentenced Rodriguez on April 11, 2000, and sentenced Camacho on June 19, 2000. Each Petitioner was sentenced to an aggregate term of life plus five years' imprisonment. In accordance with the governing sentencing law at that time, the Court regarded the United States Sentencing Guidelines as mandatory. Each Petitioner filed a timely notice of appeal.

While Petitioners' appeals were pending, they moved in this Court for a new trial under Fed. R. Crim. P. 33 on the basis of newly discovered evidence, which focused again upon statements ascribed to Cherry. After an evidentiary hearing, this Court granted that motion. 188 F. Supp. 2d 429 (S.D.N.Y. 2002). The government moved for reconsideration, in light of further evidence calling into question the basis for the Court's earlier holding. Upon reconsideration, this Court vacated its earlier grant of a new trial. 353 F. Supp. 2d 524 (S.D.N.Y. 2005). Petitioners added an appeal of that ruling to their appeal from their underlying convictions.

The Second Circuit ruled on those appeals in a summary order reported at 187 F. App'x 30 (2d Cir. June 12, 2006), the first of its two decisions in the case ("*Camacho I*"). *Camacho I* affirmed the judgments as to the convictions of Petitioners, affirmed this Court's ultimate order denying Petitioners' motion for a new trial, and remanded the case to this Court "pursuant to *United States v. Crosby*, 397 F.3d [103,] 119 [(2d Cir. 2005)], for the limited purpose of affording the district court an opportunity to consider whether to resentence the defendants." 187 F. App'x at 36. In that

regard, the Second Circuit said that "the parties agree that a *Crosby* remand is warranted because the district court considered the United States Sentencing Guidelines to be mandatory. Thus, we remand for a decision whether to resentence." *Id*. at 35 (citing *Crosby*, 397 F.3d at 119). The remand was required because subsequent Supreme Court cases established that the Guidelines were advisory, not mandatory.

On remand, Petitioners renewed their initial motion for a new trial, relying on additional newly obtained evidence. I denied that motion, 586 F. Supp. 2d 208 (S.D.N.Y. 2008), and subsequently resentenced Petitioners pursuant to the *Crosby* remand. This Court sentenced each Petitioner to a 30-year aggregate term of imprisonment, to be followed by five years' supervised release. Petitioners appealed again to the Second Circuit, both from the denial of their renewed Rule 33 motion for a new trial and from the sentences imposed. In a summary order reported at 511 F. App'x 8 (2d Cir. 2013) ("*Camacho II*"), the court of appeals held that "the district court did not abuse its discretion in denying defendants' motion for reconsideration" of their new trial request, *id.* at 11, and upheld the sentences imposed by this Court. Camacho and Rodriguez are currently serving those sentences.

Petitioners filed writs of certiorari with respect to the Second Circuit's decision in *Camacho II*. The Supreme Court denied the writs on June 10, 2013. 133 S. Ct. 2815 (2013). Petitioners filed the present separate petitions on June 6, 2014. Those filings were timely under the governing law. The petition on behalf of Jaime Rodriguez bears docket number 14 Civ. 4628. The petition on behalf of Steven Camacho bears docket number 14 Civ. 4846. The petitions seek habeas corpus relief pursuant to 28 U.S.C. § 2255. The briefs and exhibits in support of the petitions are filed

jointly, on behalf of both petitioners.  The government opposes both petitions in a single brief.[2]

## II.  THE HABEAS PETITIONS

### A.      Summary of Asserted Grounds for Habeas Relief

Petitioners invoke the provisions of 28 U.S.C. § 2255.  The statute provides in pertinent part that a prisoner in federal custody "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).   In the case at bar, the Petitioners contend that their convictions are flawed by the government's violations of two Amendments to the Constitution: the Fifth and the Sixth.

The Petitioners' 146-page Main Brief asserts these three grounds for habeas relief:

"GROUND ONE:     The Government's Pattern of Prosecutorial Misconduct Violated Petitioners' Fifth Amendment Due Process Rights."   Main Brief for Petitioners ("M.B.") at 12.  As this caption indicates, the first ground for habeas relief is rooted in the Due Process Clause of the Fifth Amendment.

"GROUND TWO: Ineffective Assistance of Trial Counsel." *Id.* at 76.

"GROUND THREE:  Ineffective Assistance of Appellate Counsel." *Id.* at 132.  The latter two grounds for habeas relief are rooted in the "Assistance of Counsel" Clause of the Sixth Amendment.

The briefs for Petitioners contain numerous criticisms of what prosecutors did, and defense

---

[2]  The captions in these cases, following the usual form in habeas corpus proceedings, refer to Camacho and Rodriguez as "Petitioners" and the United States as "Respondent."  The text of § 2255 refers to a prisoner's request for habeas relief as a "motion."  Either nomenclature is recognized.  In this Ruling, I refer to the petitioners' filings as "petitions."

counsel failed to do, during the successive stages of the case: trial, post-trial motions, and direct appeal. Instances of perceived misconduct on the part of prosecutors are collected in Ground One of the petitions. The perceived failures in representation, by defense trial counsel and then by defense appellate counsel, are collected in Grounds Two and Three respectively. The incidents complained of overlap to a considerable degree. Thus, Petitioners condemn particular conduct on the part of a prosecutor, as violating of their due process rights; and they also condemn defense attorneys' failure to prevent or object to the same prosecutorial conduct, as violating their right to the effective assistance of counsel.

**B.      Bars to, and Limitations Upon, These Grounds for Habeas Relief**

Petitioners Camacho and Rodriguez, whose two appeals were previously rejected by the Second Circuit, use this § 2255 petition as the vehicle for a collateral attack upon their convictions.

"Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2010) (citations and internal quotation marks omitted). The Second Circuit continued in *Yick Man Mui*:

> In the case of a collateral challenge based on constitutional claims, two separate rules regarding claim preclusion based on a prior adjudication apply. First, the so-called mandate rule bars re-litigation of issues already decided on direct appeal. The mandate rule prevents relitigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate. . . .
>
> A second rule that applies in the Section 2255 context prevents claims that could have been brought on direct appeal from being raised on collateral review absent cause and prejudice.

614 F.3d at 53-54.

That second preclusive rule has come to be known as the "procedural default" rule. As the Second Circuit noted in *Yick Man Mui*: "However, where as here, a petitioner's collateral challenge includes claims of ineffective assistance of counsel, there is an important exception to the procedural default rule," the exception being that "a petitioner may bring an ineffective assistance of counsel claim whether or not the petitioner could have raised the claim on direct appeal." *Id.* at 54 (citing *Massaro v. United States*, 538 U.S. 500, 509 (2003)).

In addition, an ineffective assistance of counsel claim has a limiting effect upon the operation of the mandate rule. The Second Circuit also held in *Yick Man Mui* that

> a defendant who raises on direct appeal ineffective assistance claims based on the strategies, actions, or inactions of counsel that can be, and are, adjudicated on the merits on the trial record, is precluded from raising new or repetitive claims based on the same strategies, actions, or inactions in a Section 2255 proceeding. However, such a defendant is not precluded from raising new ineffective assistance claims based on different strategies, actions, or inactions of counsel in a subsequent Section 2255 proceeding.

614 F.3d at 51. That limited preclusive effect does not apply in the cases at bar, since Camacho and Rodriguez did not assert ineffective assistance claims on direct appeal.

Under this holding in *Yick Man Mui*, the mandate rule may not preclude Petitioners' claims of ineffective assistance claims made for the first time in this habeas proceeding. However, consideration must be given to Second Circuit cases decided after *Yick Man Mui*, which suggest that a claim presented in different terms and rejected on direct appeal may not thereafter be renamed or repackaged as an ineffective assistance claim and asserted in a habeas petition. These cases are discussed in Part IV.B., *infra.*

## C.     Structure of the Habeas Petitions

Ground One of the petitions asserts that "the Government's pattern of prosecutorial misconduct violated Petitioners' Fifth Amendment due process rights." M.B. at 12. In support of that generally worded accusation, the Petitioners' Main Brief lists numerous ways in which the prosecutors are said to have behaved improperly. These criticisms are divided among several phases of the case, as it wound its way through the district court and in the court of appeals. The complaints in the Main Brief relate to:

*   The superseding of the indictment.

*   The government's introduction at trial of background evidence.

*   The government's introduction at trial of evidence relating to firearms.

*   A *Brady* violation, with respect to information about a cooperating witness.

*   Improper closing arguments by the prosecutors.

*   After conviction, the prosecutors' conduct relating to defendants' new trial motion.

*   Improper statements and arguments in the government's appellate brief.

*   Improper statements in the government's appellate argument.

Some of these categories of discontent are further broken down into specific allegations of prosecutorial misconduct.

Ground One for habeas relief, thus structured, is followed by Ground Two, which asserts ineffective assistance of trial counsel. Camacho and Rodriguez were represented by separate counsel. Both attorneys are charged with having provided assistance that was constitutionally ineffective. The same charge is made in Ground Three, with respect to the attorneys who represented Petitioners in the Second Circuit.

For the most part, Petitioners' criticisms of their attorneys mirror the criticisms they make against the prosecutors. In Petitioners' view, the prosecutors are to blame for their misconduct, and defense counsel are to blame for nor preventing or making timely objection to that misconduct. For example, this mirroring effect is reflected in the index to Petitioners' Main Brief: Ground One (prosecutorial misconduct) charges that "the government vouched for its witnesses using its integrity," ¶ IV.E.6, and Ground Two (ineffective assistance of trial counsel) charges that "counsel failed to object to the government's vouching for its witnesses by using the integrity of the government," ¶ V.D.6.

### III. EVALUATION OF THE PETITIONS

If these habeas petitions were confined to Camacho's and Rodriguez's claims of prosecutorial misconduct, then those claims would be subject to possible preclusion by the mandate rule or the procedural default rule. However, many of the habeas claims are also cast as ineffective assistance claims. Since Petitioners raise their ineffective assistance claims for the first time in these proceedings, the preclusive rules may not apply to them.

In those circumstances, the better course for the Court to follow is to first consider whether Petitioners have demonstrated on this record viable claims for the ineffective assistance of counsel, under the cases determinative of that question. If Petitioners have done so, they will be entitled to habeas relief. If no viable claim for ineffective assistance of counsel is present in these cases, the Court must then consider Petitioners' due process claims in the light of the mandate rule and the procedural default rule.

# IV.  PETITIONERS' INEFFECTIVE ASSISTANCE CLAIMS

## A.    Standard of Review

Camacho and Rodriguez contend that the Constitution requires their convictions to be set aside because their respective attorneys' assistance at the trial and on appeal was ineffective.  The constitutional basis for this contention is found in the "Assistance of Counsel" Clause of the Sixth Amendment:

> In all criminal prosecutions, the accused shall enjoy the right . . . to
> have the Assistance of Counsel for his defence.

In the seminal case of *Strickland v. Washington*, 466 U.S. 668, 686 (1984), the Supreme Court "recognized that the right to counsel is the right to effective assistance of counsel." (citation and internal quotation marks omitted).  *Strickland* held that the purpose of the constitutional requirement of effective assistance was "to ensure a fair trial."  *Id*.

Subsequently the Court, in *Evitts v. Lucey*, 469 U.S. 387 (1985), having held that due process guaranteed a criminal appellant the right to counsel, posed the additional question of "whether the appellate-level right to counsel also comprehends the right to effective assistance of counsel." *Id*. at 392, and answered in the affirmative: "A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."  *Id.* at 396 (footnote omitted).  The Court reasoned in *Evitts* that the promise "that a criminal defendant has a right to counsel on appeal" would be "a futile gesture unless it comprehended the right to the effective assistance of counsel."  *Id.* at 397.

Within the trial context, prior to the decision in *Strickland* the Court, with the exception of a conflict of interest, had "never directly and fully addressed a claim of 'actual ineffectiveness' of

counsel's assistance in a case going to trial." *Strickland*, 466 U.S. at 683.  The opinion in *Strickland v. Washington* undertook to define that concept.  The Court began with this principle:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Id*. at 686.  That principle is implemented under *Strickland* in this manner:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.  A defendant bears the burden of satisfying both components.  "Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense,"  466 U.S. at 693, a component requiring the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id*. at 700.

The same requirements and limitations apply to a claim of ineffective assistance on the part of appellate counsel.  "Although the *Strickland* test was formulated in the context of evaluating a

claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citations omitted). *See also Smith v. Robbins*, 528 U.S. 259, 289 (2000): "Robbins must satisfy both prongs of the *Strickland* test in order to prevail on his claim of ineffective assistance of appellate counsel."

"In evaluating the prejudice component of the *Strickland* test, a court must determine whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." *Mayo,* 13 F.3d at 534. In the appellate context, "counsel has no duty to raise every non-frivolous issue that could be raised. Nevertheless, appellate counsel's performance must meet prevailing professional norms." *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (citations omitted). "To establish prejudice in the appellate context, a petitioner must show that, had his claim been raised on appeal, there is a reasonable probability that it would have succeeded before the state's highest court." *Id*. (citation omitted). The deficiency of an appellate attorney's performance must be of a magnitude sufficient to achieve the constitutional dimension required of a viable claim for ineffective assistance. *See Smith v. Murray*, 477 U.S. 527, 535 (1986): "Nor can it seriously be maintained that the decision not to press the claim on appeal was an error of such magnitude that it rendered counsel's performance constitutionally deficient under the test of *Strickland v. Washington.*"

Given these demanding requirements, one reads without surprise the Court's acknowledgment in *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) that "[s]urmounting *Strickland*'s high bar is never an easy task." The Court must determine whether these Petitioners' claims of ineffective assistance of counsel clear that high bar.

**B.      Petitioners' Claims of Ineffective Assistance and the Mandate Rule**

The Second Circuit has filed two opinions in these cases, referred to herein as *Camacho I* and *Camacho II*.  Each opinion rejected claims by Petitioners that their convictions should be vacated. To the extent that Petitioners' claims are based on allegedly ineffective assistance of counsel, the procedural default rule does not preclude the claims.  The situation with respect to the mandate rule is more complicated.  The Second Circuit's decisions in *Camacho I* and *Camacho II* lead to the threshold question of whether the mandate rule precludes Petitioners' ineffective assistance claims, in whole or in part.

"The 'mandate rule' has existed since the earliest days of the judiciary."  *In re Coudert Brothers LLP*, 809 F.3d 94, 98 (2d Cir. 2015) (citation and internal quotation marks omitted).  The rule "bars re-litigation of issues already decided on direct appeal."  *Yick Man Mui*, 614 F.3d at 53. The rule is broadly construed and applied; Judge Winter's opinion in *Yick Man Mui* continues:

> The mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate.  To determine whether an issue may be reconsidered on remand, a district court should look to both the specific dictates of the remand order as well as the broader spirit of the mandate.

*Id.* (citations and internal quotation marks omitted).

In *Coudert Brothers* the Second Circuit cited, quoted and applied *Yick Man Mui* when it reversed a bankruptcy court for basing its ruling on remand on a ground other than that specified in the court of appeals' order for remand.  "Far from giving full effect to our mandate in *Coudert I*," Judge Chin wrote with some asperity, "the bankruptcy court here essentially gave it no legal effect." 809 F.3d at 99.  The Second Circuit condemned the bankruptcy court's violation of the mandate rule:

By that rule, a lower court must follow the mandate issued by an appellate court.

> In following a mandate, the lower court must carry out its duty to give the mandate full effect. The lower court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.

*Id.* at 98 (citations and internal quotation marks omitted). Turning to the case before it, the Second Circuit said in *Coudert:* "Our mandate impliedly decides at least enough issues to allow it to be effective, even if not all issues are made explicit," and quoted *Yick Man Mui*, 614 F.3d at 53: "factual predicates of . . . claims, while not explicitly raised on direct appeal, were nonetheless impliedly rejected by the appellate court mandate." *Id*. at 101-102 (some citations omitted).

The Second Circuit's opinion in *United States v. Malki*, 718 F.3d 178 (2d Cir. 2013), bears a closer resemblance to the case at bar. *Malki* is also a criminal case. Malki was convicted on a guilty plea, rather than after trial as were Camacho and Rodriguez. Malki appealed from his sentence. The Second Circuit held that the district court had misapplied the Sentencing Guidelines in one particular respect, and remanded the case for resentencing (as the court of appeals did in this case, its *Camacho I* opinion). A different district judge, in his resentencing of Malki, interpreted the Second Circuit's remand as one for resentencing *de novo*, and included unrelated Guidelines calculations which differed from those adopted by the initial district judge. On renewed appeal, the Second Circuit held that the district judge on resentencing violated the mandate rule:

> When we overturn a sentence without vacating one or more underlying convictions and remand for resentencing, the "default rule" is that the remand is for limited, and not *de novo,* resentencing. When our remand is limited, the mandate rule generally forecloses re-litigation of issues previously waived by the parties or decided by the

> appellate court. Similarly, it "also precludes re-litigation of issues
> impliedly resolved by the appellate court's mandate." *Yick Man Mui
> v. United States*, 614 F.3d 50, 53 (2d Cir.2010).

718 F.3d at 182 (some citations omitted). The *Malki* opinion resonates in the case at bar because the Second Circuit's descriptive phrase in *Malki* – "when we overturn a sentence without vacating one or more underlying convictions and remand for resentencing" – mirrors what transpired in the case of Camacho and Rodriguez.

*Jones v. United States*, 543 F. App'x 67 (2d Cir. 2013), resembles the case at bar even more closely. A jury convicted Jones on nine felony counts involving crimes of violence stemming from his membership in "a Brooklyn-based violent drug gang," of the sort comparable to the C&C Bronx-based gang in which Camacho and Rodriguez participated. The Second Circuit summarized the procedural history in *Jones*:

> The District Court for the Eastern District of New York sentenced
> Jones principally to 252 months' imprisonment. We affirmed Jones's
> conviction and sentence on appeal. Jones subsequently moved in the
> District Court to vacate, set aside, or correct his sentence, pursuant to
> 28 U.S.C. § 2255, and the District Court denied the motion. Jones
> now appeals.

543 F. App'x at 68 (citations and notations of District Judges' names omitted). Jones contended in his habeas petition that his trial counsel was constitutionally ineffective for "failure to seek an appropriate jury charge regarding the existence of multiple conspiracies, or to argue that the evidence showed, if anything, a different conspiracy than the one charged in the indictment." *Id*. at 69. The Second Circuit rejected this claim, in language so instructive in the instant case that I quote it at length:

> Jones's second argument is that his trial counsel was
> constitutionally ineffective "in failing to make the proper record and

requests for a multiple conspiracies charge." The District Court rejected this argument on the ground that the Court of Appeals had already considered, and rejected, the argument on direct appeal. *Jones*, 2012 WL 3288749, at *2. "In addressing a § 2255 motion, a district court cannot revisit issues already decided on direct appeal." (citing *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010)).

On appeal we held that "the jury reasonably found that the government had proved the single conspiracy alleged in the indictment beyond a reasonable doubt" and that the "district court's failure to give a multiple-conspiracies instruction [was not] error because only one conspiracy was alleged and proved." *Jones*, 375 F. App'x at 96 (internal quotation marks omitted). *Jones's claims fare no better when reframed as an ineffective assistance of counsel argument.*

543 F. App'x at 71 (citation omitted and emphasis added).

*See also Flaquer v. United States*, 518 F. App'x 35, 36 (2d Cir. 2013): "Because we have already held [on direct appeal] that the imposition of the role enhancement was proper based on the facts considered at sentencing, we have impliedly considered and rejected Flaquer's ineffective assistance claim" (citing *Yick Man Mui*), "and the district court properly concluded [on a § 2255 habeas petition] that Flaquer's claim was barred." This is an application of the mandate rule, although the Second Circuit did not use the phrase in its summary order.

*Jones* and *Flaquer* both involved, as does the case at bar, a criminal conviction followed by an unsuccessful direct appeal and subsequent § 2255 habeas petition, where ineffective assistance of counsel was one of the asserted grounds for habeas relief. The mandate rule has an effect upon an ineffective assistance claim in a habeas context. The Second Circuit gave that question prominent attention in *Yick Man Mui*, to which I return.

The defendant in *Yick Man Mui* was convicted by a jury of committing violent crimes in aid

of racketeering. Prior to sentencing, defendant, represented by new counsel, moved for a new trial on the ground that trial counsel had provided unconstitutionally ineffective assistance with respect to certain specific instances during the trial of what counsel had done or failed to do. The district court denied that motion, holding that defendant had failed to show either that counsel's performance fell below objectively reasonable standards or that defendant had a reasonable probability of a different result but for counsel's errors. Defendant failed, in short, to satisfy the familiar requirements of *Strickland v. Washington*, 466 U.S. 668 (1984). The district court then sentenced defendant to a life term. On direct appeal, defendant again raised ineffective assistance claims, predicated on the same errors of counsel asserted in his motion for a new trial, and making two additional ones. The Second Circuit affirmed defendant's conviction in a summary order that rejected on the merits defendant's several claims of ineffective assistance of trial counsel.

Thereafter, defendant filed a § 2255 habeas proceeding, claiming various instances of ineffective assistance of trial counsel.[3] The Second Circuit said of those claims:

> In his Section 2255 motion, appellant again raised trial counsel's concession in the opening statement, counsel's failure to present an agreed upon defense, and counsel's failure to file certain pre-trial motions. All of these claims were disposed of on direct appeal. However, appellant also raised a host of other allegations of ineffective assistance not raised on direct appeal.

614 F.3d at 52.

The district court denied defendant's habeas motion. As summarized by the Second Circuit, the district court ruled that

---

[3] Defendant's habeas petition also claimed ineffective assistance of appellate counsel, but the certificate of appealability covered only claims relating to trial counsel, and so the performance of appellate counsel was not considered by the Second Circuit in the decision discussed in text. *See* 614 F.3d at 52 n. 1.

appellant was procedurally barred from raising ineffective trial counsel claims that he had raised on direct appeal. As for the ineffective assistance claims raised for the first time in the Section 2255 motion, the court concluded that these claims were also barred because appellant did not show cause for not raising the claims on direct appeal or any prejudice resulting therefrom, and that appellant could not show "factual innocence" that would otherwise create an exception to the procedural default rule.

614 F.3d at 52.

As appears from this summary, the habeas district court in *Yick Man Mui* held that all ineffective assistance claims, whenever asserted, were barred by the procedural default rule. On appeal from the district court's denial of habeas relief, the Second Circuit reversed in part, for the reason that in *Massaro v. United States*, 538 U.S. 500 (2003), the Supreme Court, abrogating the Second Circuit's then existing procedural default rule stated in *Billy-Eko v. United States*, 8 F.3d 111 (2d Cir. 1993), held that "a petitioner may bring an ineffective assistance of counsel claim whether or not the petitioner could have raised the claim on direct appeal." *Yick Man Mui,* 614 F.3d at 54 (citing *Massaro*, 538 U.S. at 509).

However, Judge Winter's opinion in *Yick Man Mui* noted pointedly:

> Although *Massaro* rejected our procedural default rule under *Billy-Eko*, it did not disturb our application of the mandate rule to ineffective assistance claims brought in a Section 2255 proceeding. Even after *Massaro*, therefore, a Section 2255 petitioner may not "relitigate questions which were raised and considered on direct appeal," *United States v. Becker*, 502 F.3d 122, 127 (2d Cir.2007), including questions as to the adequacy of counsel. *See Fuller v. United States*, 398 F.3d 644, 649-50 (7th Cir.2005). Accordingly, the district court did not err in dismissing those claims that had been raised and decided on direct appeal.

614 F.3d at 55. One should recall that, according to an earlier paragraph in the same opinion, the

just-quoted phrase "decided on direct appeal" includes "matters expressly decided" by the Second Circuit's opinion *and* "issues impliedly resolved" by the Second Circuit's mandate. *Id*. at 53.

*Yick Man Mui* presented the Second Circuit with a complex situation because, as Judge Winter noted:

> Unlike the petitioner in *Massaro*, appellant has raised claims of ineffective assistance at various stages of litigation: first in his motion for a new trial, then on direct appeal, and now in the instant Section 2255 proceeding. While some of the claims raised in his Section 2255 petition mirror those raised in his motion for a new trial and on direct appeal, others do not.

*Id.* at 54-55.

Those circumstances led the Second Circuit in *Yick Man Mui* to reflect upon limitations in *Massaro*'s instructions on the application of preclusive rules in the habeas context:

> Of course, *Massaro* allows a habeas petitioner to raise ineffective assistance claims in a Section 2255 petition even though no ineffective assistance claims were raised on direct appeal. However, *Massaro* does not answer the question whether a Section 2255 petitioner, having already raised one or more ineffective assistance claims on direct appeal that were disposed of on the merits, may raise additional ineffective assistance claims in a habeas proceeding. . . . [The Court] declined to rule on the preclusive effect of ineffective assistance claims decided on direct appeal as to new such claims raised in subsequent collateral proceedings.

*Id*. at 55.

In *Yick Man Mui* the Second Circuit undertook to fill in that gap. The court of appeals rejected the government's argument that "a defendant must choose between bringing all ineffective assistance claims on direct appeal or holding them all for a Section 2255 proceeding," a contention the government based on a Seventh Circuit holding that "all of a petitioner's claims of ineffective counsel were a 'single round for relief no matter how many failings the lawyer may have displayed.'"

614 F.3d at 55 (citing and quoting *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)). The Second Circuit's *Yick Man Mui* decision rejects "a single-proceeding rule" for ineffective counsel claims in the habeas context, and fashions an alternative, as explained in this reasoning:

> We recognize that, where a defendant alleges varying factual predicates to support identical legal claims relating to a particular event, all claims constitute a single "ground" for relief for purposes of applying the mandate rule in collateral proceedings. . . .
>
> With regard to ineffective assistance claims, it makes sense to require all legal or factual arguments to be made in the case of a *particular strategy, action, or inaction of a lawyer* alleged to constitute ineffective assistance. However, little is served by a rule that causes an adjudication of a single ineffective assistance claim to preclude a later resort to the Sixth Amendment involving *a different strategy, action, or inaction of counsel*.

614 F.3d at 55-56 (emphasis added). The Second Circuit rule that emerged from this reasoning is stated at the conclusion of the *Yick Man Mui* opinion:

> [T]he only barrier to raising ineffective assistance claims in a Section 2255 proceeding after raising such claims on direct appeal is the mandate rule, i.e., strategies, actions, or inactions of counsel that gave rise to an ineffective assistance claim adjudicated on the merits on direct appeal may not be the basis for another ineffective assistance claim in a Section 2255 proceeding.

*Id*. at 57. That particular complication does not exist in the cases at bar because neither Camacho nor Rodriguez raised ineffective assistance claims on their direct appeals. They assert ineffective assistance claims for the first time in these § 2255 petitions.

One may distill from the cited cases principles which govern ineffective assistance claims in the Second Circuit where, as in the case at bar, the ineffective assistance claim was not made on direct appeal, but is asserted for the first time in a habeas petition. Those principles are:

The *procedural default rule* does not operate to preclude an ineffective assistance claim

asserted for the first time as a ground for habeas relief. A habeas petitioner may bring an ineffective assistance of counsel claim whether or not he could have raised the claim on direct appeal and omitted to do so. That is the Supreme Court's teaching in *Massaro*.

Depending upon the circumstances of the case, the *mandate rule* may preclude an ineffective assistance claim asserted for the first time in a post-appeal habeas petition. The mandate rule is not confined to foreclosing re-litigation of underlying issues explicitly or implicitly decided on appeal. It also bars re-litigation of an ineffective assistance claim whose factual predicates were impliedly rejected by the appellate court mandate, even if the assistance claim asserted on habeas had not been expressed in those terms on direct appeal. That is the holding in *Jones*, 543 F. App'x at 71, where the Second Circuit, having rejected on direct appeal a challenge to the trial court's multiple conspiracies charge, said dismissively in the subsequent habeas proceeding that "Jones's claims fare no better when reframed as an ineffective assistance of counsel argument." This principle applies to Camacho and Rodriguez, who asserted a number of claims on direct appeal, but did not characterize any of them as an ineffective assistance claim.

In *Yick Man Mui* the Second Circuit teaches further that where an ineffective assistance claim is asserted on direct appeal and rejected by the court of appeals on the merits, the mandate rule bars any subsequent habeas claim of ineffective assistance arising out of the same strategy, action or inaction of an attorney alleged to constitute ineffective assistance. In contrast, the mandate rule does not preclude "a later resort to the Sixth Amendment involving a different strategy, action, or inaction of counsel." 614 F.3d at 55. That particular principle does not apply to Camacho and Rodriguez, who did not assert ineffective assistance claims on direct appeal. I must, however, consider whether the Second Circuit's rejection of a due process claim impliedly rejects a "reframed" ineffective

assistance claim based upon the same facts and circumstances.

**C.  Application of the Mandate Rule to These Petitions**

Given the instructions of these precedents, a proper application of the mandate rule to the cases at bar requires this Court to analyze carefully what the Second Circuit held on direct appeal in *Camacho I* and *Camacho II*, and then analyze the ineffective assistance and due process claims Camacho and Rodriguez assert in their habeas petitions.

**1.  The Second Circuit's First Decision on Appeal:  *Camacho I***

In *Camacho I*, 187 F. App'x  30 (summary order), the Second Circuit affirmed the convictions of Camacho and Rodriguez, and remanded the case for possible resentencing under *United States v. Crosby*, 397 F.3d 103, 119 (2d Cir. 2005).  In this Ruling, I am concerned only with the affirmance of the convictions.  The court of appeals divided that part of its opinion into numbered sections.  I will replicate those numbers.

First: The Second Circuit held that this Court did not abuse its discretion in admitting at trial evidence "from the so-called 'Black Rain' trial," evidence that was relevant under Federal Rule of Evidence 401 "because its existence made more probable the material fact that defendants had an affiliation with the C&C enterprise beginning with their dealing of drugs in C &C territory," and whose admission passed muster under Rule 403 as not "unduly prejudicial."  187 F. App'x at 33.

Second: The Second Circuit rejected the contentions of Camacho and Rodriguez that their convictions must be reversed "because the district court violated their Sixth Amendment rights in limiting cross-examination of Douglas Welch." *Id.*  Welch was an important government witness at trial who was driving the Petitioners about on the night the crimes of conviction were committed. In an opinion denying Petitioners' post-trial motions, I concluded that their trial counsel were allowed

23

enough cross-examination so that "the jury possessed sufficient facts to make a discriminating appraisal of the particular witness's [Welch's] credibility." 1998 WL 472844 at *6 (S.D.N.Y. Aug. 10, 1988). The Second Circuit affirmed on that point, holding that "[a]ny error in limiting examination into some of Welch's specific acts of criminal conduct and malfeasance was harmless because substantial cross-examination was allowed, another witness (Albizu) corroborated Welch's account of the material events, and Welch's testimony, including that about his past crimes and nefarious activities, provided plentiful information for the jury to appraise his trustworthiness." 187 F. App'x at 33.

Third: Under this number, the Second Circuit discussed three due process contentions Petitioners made on direct appeal, each of which the court of appeals rejected: (a) prosecutorial misconduct; (b) improper closing arguments; and (c) improper prosecutorial vouching for witnesses.

(a). Defendants' *prosecutorial misconduct* contention focused on the trial testimony of Albizu, a key government witness. The Second Circuit, affirming this Court, held that defendants (the present Petitioners) "have not shown that Albizu committed perjury in testifying that the carjacking was on a night before the murders and that Cherry was absent on the night of the murders because they have not shown that Albizu deliberately testified falsely." *Id.* "Differences in recollection alone do not add up to perjury," the court of appeals reasoned, and thus "defendants' due process claims premised on the allegedly perjured testimony fail." *Id.* Additionally, the Second Circuit noted: "[t]he defendants' contention that the government relied on 'irreconcilable theories' also fails. There is no conflict in believing that both Padilla and Albizu were motivating forces behind the murders. A new trial is not warranted on these bases." *Id.*

(b). Defendants' *closing arguments* contention focused upon several aspects of the

prosecutors' summations, all of which the Second Circuit rejected as a basis for appeal:

* The court of appeals held that "the prosecution fairly used the term 'lie' to comment upon the testimony of defense witnesses whose credibility was central to the defense."

* The court of appeals observed that the defendants had not even attempted to show "that any misrepresentation in recounting Nancy Melendez's testimony was deliberate, as is required to show prosecutorial impropriety"; indeed, "defendants cite not even a single case anywhere in their four-page argument on this point to establish that the prosecution's remarks were improper."

* The court of appeals also said: "As for the use of the 'Black Rain' evidence in summation, including display of the guns, we find no impropriety justifying reversal," where the prosecutors simply reiterated "the district court's proper instruction that the evidence should be used only as background evidence," and displayed the seized guns "to rebut defense counsel's closing argument that defendant Rodriguez had no place in the web of violence." *Id.* at 33-34.

(c). Defendants' *prosecutorial vouching* contention focused on the prosecutors' references during summation to three important government witnesses: Crespo, Albizu, and Welch. The Second Circuit held that "the alleged incidents of prosecutorial vouching for witnesses do not warrant reversal." *Id.* at 34. The court of appeals reasoned that the government's cooperation and non-prosecution agreements with these witnesses "were part of the record here and were properly cited in summation," and even if the prosecutor acted improperly in commenting during summation that the government "did not coach its witnesses," "we hold that it did not result in substantial prejudice to the defendants, much less show the flagrant abuse necessary to secure reversal where, as here, the defendants did not object to the prosecutor's summation at trial." *Id*. (citation and internal quotation marks omitted).

Fourth: The Second Circuit rejected the claims of Camacho and Rodriguez that "due process required the district court to grant immunity to Gregory Cherry." 187 F. App'x at 34. The court of appeals reasoned that the case did not present "an exceptional circumstance in which the government has engaged in discriminary use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the fifth amendment." *Id.* (citation and internal quotation marks omitted). Moreover, "the purported prosecutorial wrongdoing argued by the defendants does not satisfy this requirement because it does not bear on Cherry's testimony or his anticipated invocation of the Fifth Amendment privilege." *Id.* The Second Circuit summed up the point by concluding that the government's decision to withhold immunity from Cherry "was not the result of a discriminatory use of immunity by the government, nor of any other prosecutorial overreaching, but rather seems to be solely the result of Cherry's own willingness to change his story." *Id.* (citations, internal quotation marks, brackets and ellipsis omitted).

Fifth: The Second Circuit rejected the claim of Camacho and Rodriguez that "the evidence at trial was insufficient to prove the charged crimes." *Id.* at 34-35. Defendants did not contend on appeal "that Welch's and Albizu's testimony standing alone is insufficient to sustain the verdict"; rather, they argued that "no rational jury could have believed these prosecution witnesses over the defense witnesses." *Id.* at 35. The Second Circuit gave that argument short shrift: "Because a rational jury could believe the prosecution witnesses and not the defense witnesses, we honor the jury's resolution of the weight of the evidence." *Id.*

The sixth aspect of the Second Circuit's opinion in *Camacho I* recited the parties' agreement to a remand for possible resentencing under *Crosby.*

In the seventh and last section of *Camacho I*, the Second Circuit affirmed this Court's denial

on rehearing of Camacho's and Rodriguez's motion for a new trial, a motion that depended upon statements by Gregory Cherry. The Second Circuit held that "the district court did not err in finding that the defendants failed to meet their burden of showing that 'corroborating circumstances clearly indicate the trustworthiness of [Cherry's] statement,' Fed. R. Evid. 804(b)(3), as required to render Cherry's hearsay statement admissible and win their new-trial motion." *Id.* The court of appeals reviewed the relevant events, and concluded: "The district court exercised its discretion in weighing the circumstances, and we find no abuse of discretion in its finding that corroborating circumstances did not clearly indicate the trustworthiness of Cherry's statement." *Id.* at 36.

In that regard, the Second Circuit said: "The district judge's findings, including its statement that Melendez was confined to a special housing unit 'at the pertinent time,' are supported by the record." *Id.* That is a reference to Jose Melendez, a federal inmate who was incarcerated with Cherry, and informed prosecutors that Cherry had told him his statements, exculpatory of Camacho and Rodriguez and the basis for my initial opinion granting them a new trial, had been fabricated by Cherry to confound the government.

Melendez 's testimony to that effect, as a witness for the government at the evidentiary hearing on the government's reconsideration motion, resulted in reconsideration being granted by this Court and a new trial denied: "Unless Melendez's testimony is rejected as unworthy of belief, the indications in the expanded record point to the untrustworthiness of those declarations [by Cherry], rather than to their trustworthiness." 353 F. Supp. 2d at 537. Petitioners' contention at this rehearing was that Melendez had read the Court's earlier opinion in their favor and made up his own statement to curry favor with the government: "[t]he defendants' theory of the case assumes that Melendez read, marked, learned and inwardly digested the Court's opinion in *Camacho II* [granting

a new trial], which inspired him to fabricate the statements by Cherry that Melendez recounted to the government." *Id*. at 534. Melendez testified that, to the contrary, "he had never read any of the Court's opinions in the case," an averment supported to some degree by the fact, noted in the initial opinion, that all inmates had access to the prison library "in one way or another, but inmates confined in a special housing unit, *as Melendez was at the pertinent time*, in lockdown 23 hours a day, would have to use a contained 'satellite' library in the unit and request that particular volumes be brought to them." *Id*.

I resolved this particular issue as follows:

> What all this comes down to is that while Melendez was in the MCC he could have read the opinion in *Camacho II*, there is no evidence that he did so, his access to the law library was limited, he was busily pursuing his own agenda in Judge McKenna's case, and he denied having read any of the opinions in this case. I am not persuaded by defendants' speculation to the contrary.

*Id.* at 535. That is the aspect of the case that the Second Circuit specifically approved in *Camacho I*, on its way to affirming the convictions of Camacho and Rodriguez and the denial of their new trial motion.

## 2. The Second Circuit's Second Decision on Appeal: *Camacho II*

The Second Circuit filed its opinion in *Camacho I* on June 12, 2006. During the remand to this Court, Camacho and Rodriguez renewed their motion for a new trial, this time relying upon the newly discovered evidence of "yet another federal inmate (Morales) in order to cast doubt upon the evidence given by a different federal inmate (Melendez)." 586 F. Supp. 2d 208, 217 (S.D.N.Y. 2008).[4] I denied that motion for a new trial and sentenced Petitioners on the underlying convictions.

---

[4] *Aff'd sub nom. United States v. Padilla*, 511 F. App'x 8 (2d Cir. 2013).

They appealed from the denial of the renewed new trial motion and from the judgments imposing their sentences.

The Second Circuit affirmed on both questions in *Camacho II*, 511 F. App'x  8.  On the new trial issue,  the court of appeals said that "the defense motion touches on only one part of the court's reasoning for vacating its earlier grant of a new trial.  The district court found that the defendants had failed to show that Melendez had lied in the earlier proceeding and that the scenario presented by the defense was 'not persuasive.'" 511 F. App'x at 10 (citation omitted). The Second Circuit concluded that "the district court did not abuse its discretion in denying defendants' motion for reconsideration." *Id*. at 11.

**D.      The Mandate Rule and Petitioners' Habeas Claims of Ineffective Assistance**

This sub-part of the Discussion focuses upon the effect of the mandate rule on the claims Camacho and Rodriguez assert in their habeas petitions which are based on the allegedly ineffective assistance of counsel.

That question does not arise with respect to the procedural default rule.  As noted *supra,* the procedural default rule does not bar a habeas petitioner from claiming that he or she was prejudiced by the ineffective assistance of counsel during the prior proceeding which resulted in a conviction. To recapitulate:  It frequently occurs that the same acts or omissions at trial give rise to both a due process claim and an ineffective assistance claim.  While the procedural default rule may bar the due process claim from being a ground for habeas relief, the ineffective assistance of counsel claim does not share that vulnerability.  "The procedural-default rule," the Supreme Court said in *Massaro*,  "is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments.  We conclude that requiring a criminal defendant to bring

29

ineffective-assistance-of-counsel claims on direct appeal does not promote these objectives. . . . We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." 500 U.S. at 504.

Turning to the ineffective assistance of counsel claims made by Camacho and Rodriguez in the cases at bar, they are separately discussed in their Main Brief at pages 76 -131 (trial counsel) and pages 132-145 (appellate counsel). Petitioners contend that their separate trial counsel, either together or is some instances cases individually, provided ineffective assistance on a number of different occasions. They also charge their appellate counsel with instances of deficient performance. I will refer to those occasions in the order in which they appear in Petitioners' Main Brief ("M.B."). This Part of the Ruling considers whether Petitioners' ineffective assistance claims are barred by the mandate rule; and, to the extent they are not barred, whether the ineffective assistance claims have merit.

### 1.    Dismissal of the Indictment

Petitioners assert that their counsel provided ineffective assistance by failing to seek dismissal of the indictment against them, on the ground that the government's conduct of the case violated the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. M.B. at 75-78. The mandate rule does not preclude this claim, because Petitioners did not assert it on either of the two direct appeals, and the Second Circuit did not consider it in either opinion: *Camacho I* or *Camacho II*. The question therefore becomes whether this ineffective assistance claim, not precluded by the rule, is in itself meritorious.

Petitioners Camacho and Rodriguez were among the 17 individuals charged in the original indictment, filed on May 25, 1994. A first superseding indictment, S1 94 Cr. 313, was filed on

September 30, 1994 [Doc. 97]. During its supervision of this unwieldy case, the Court had made on the record several prospective exclusions of time from calculations under the Speedy Trial Act. A number of defendants pleaded guilty. Two defendants, Angel Padilla and Ivan Rodriguez, went to trial in March 1995 and were convicted on multiple accounts on May 16, 1995. Those convictions were upheld on appeal. 203 F.3d 156 (2d Cir. 2000). Camacho and Rodriguez remained in the case. They had not pleaded, and were awaiting trial.

There had been additional superseding indictments in the case. The twelfth superseding indictment, S12 94 Cr. 313, was filed on February 12, 1996. That indictment charged Camacho, Rodriguez, and one Antonio Feliciano with several crimes of violence. The charges in S12 against Camacho and Rodriguez related to the C&C organization and were the same as in the earlier indictments. Feliciano was a new defendant, playing no part in the C&C activities; together with Camacho and Rodriguez, he was charged with participating in the activities of a different group, the Nasty Boys, and the murder of one Miguel Parilla.

At a hearing on March 14, 1996, counsel for all three defendants stated their intention to move for severances. I directed the government to furnish further information by affidavit, 1996 WL 137318 (S.D.N.Y. March 26, 1996), and in an opinion dated May 10, 1996, reported at 939 F. Supp. 203, I granted the motion to sever Feliciano from the case, struck from indictment S12 against Camacho and Rodriguez the counts concerning the Nasty Boys and the murder of Parilla, and left "Rodriguez and Camacho to stand trial on charges related to C&C, the original provenance of the case," with trial ordered to begin on June 3, 1996. 939 F. Supp at 211. In a supplemental opinion dated September 10, 1996, I said that "I did not make a finding of bad faith" on the part of the government with respect to the substance or timing of the S12 superseding indictment. The trial of

31

Camacho and Rodriguez began on June 3, 1996. The jury convicted them. Their direct appeals were rejected.

Petitioners did not contend, before this trial court or the Second Circuit, that beginning their trial on June 3, 1996 violated the Speedy Trial Act. That contention is asserted for the first time in this habeas proceeding. Petitioners' argument is that at one point, trial on the indictment was scheduled to begin on March 11, 1996; the motions for severance were made and succeeded; and the trial of Camacho and Rodriguez began on June 3, 1996. Petitioners' Main Brief at 77-78 refers to "a delay of 83 days, from the March 11, 1996 trial date up until the actual trial date of June 3, 1996," and argues: "This 83 day delay alone, which should be in addition to the days already counted toward the speedy trial act calculation, was in violation of the 70 day limit of petitioners' statutory speedy trial rights and required dismissal of all charges." M.B. at 77-78.

Petitioners base that argument upon the provision in the Speedy Trial Act that "the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment," 18 U.S.C. § 3161(c)(1). Certain specific events result in mandatory exclusions from the 70-day period, § 3161(h)(1)-(6). In addition, the trial judge may grant continuances during which time is excluded "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." § 3161(h)(7)(A). The sanctions section of the Act, § 3162(a)(2), provides that "[i]f a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant." In the event of such a well-founded motion, the trial judge has the discretion to dismiss the indictment

with or without prejudice.  § 3162(a)(2) goes on to provide that "[i]n determining whether to dismiss the case with or without prejudice, the court shall consider, among others," certain specified factors. If the trial judge dismisses the indictment without prejudice, the government can indict the defendant again on the underlying charges and the Speedy Act clock is reset and begins to tick again.  If the dismissal is with prejudice, the defendant goes free of the charges.

The facts and circumstances of the evolution of the superseding indictment under which Camacho and Rodriguez were tried, and the timing of that trial, do not give rise to a viable claim for ineffective assistance of counsel.  Petitioners fault their attorneys for failing to move for the dismissal of the indictment on the basis of a Speedy Trial Act violation.  That ineffective assistance claim fails to satisfy both *Strickland* prongs.

As for the first prong, deficient performance of counsel, it is not clear from the petition that Petitioners have accurately calculated a more-than-70 day delay ascribable to the government before trial began on June 3, 1996.  A delay of that magnitude in commencing the trial is necessary to constitute a violation of  § 3161(c)(1).  Under § 3162, the defendant "has the burden of proof of supporting" a motion for sanctions under the Act, and the government has the burden of going forward with evidence "in connection with any exclusion of time."

In the case at bar,  Petitioners begin their Speedy Trial Act calculation by starting the 70-day clock on March 11, 1996, which they say was a previously scheduled trial date, and counting the time until trial began on June 3, 1996, more than 70 days later, which Petitioners regard as an *ipso facto* violation of the statute.  It is not at all clear that this period of time should count without extension or exclusion; and if, on a full consideration of the circumstances, no trial delay in excess of 70 countable days is demonstrated, defense counsel would have had no factual basis for moving

to dismiss the indictment, and their omitting to do so cannot be regarded as a deficient performance.

I do not pursue this issue further because Petitioners clearly fail to satisfy the second *Strickland* prong, that of prejudice. Even if defense counsel's failure to make a Speedy Trial Act motion to dismiss the indictment should be condemned as an omission "outside the wide range of professionally competent assistance" (the first *Strickland* prong, 466 U.S. at 690), Petitioners have the additional burden of showing "that the decision reached would reasonably likely have been different absent the errors" (second *Strickland* prong, 466 U.S. at 696). In the context of this case, Petitioners' presently professed Speedy Trial Act objective was the trial court's dismissal of the indictment against them *with prejudice*. The second *Strickland* prong poses this question: If defense counsel had made such a motion, and persuaded the trial judge that a trial date of June 3, 1996 violated the Speedy Trial Act and the indictment should be dismissed, would that dismissal have been with or without prejudice to the government?

I need not speculate on the answer, because I was the trial judge. I can state without fear of contradiction that if a Speedy Trial Act motion had been made before Petitioners' trial began, and I had concluded that a statutory 70-day requirement had been violated and the indictment must be dismissed, the court would have dismissed the indictment *without prejudice*. The Act, in § 3162(a)(2), instructs trial judges:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

Had the question arisen and been presented to this Court, those factors would have militated in favor of a dismissal of the indictment *without prejudice* to the government charging Camacho and

Rodriguez again for the same crimes. The offenses were of maximum severity: multiple murders. The facts and circumstances leading to June 3, 1996 as the Petitioners' trial date had to do with the complexities of a multi-defendant, multi-count initial indictment, subsequent pleas, superseding indictments, and motions by various defendants for a severance (including by Camacho and Rodriguez, a motion which succeeded). A reprosecution, had the original indictment been dismissed on Speedy Trial Act grounds, would not have taxed adversely the administration of the statute or the more generally worded "administration of justice." In these circumstances, a dismissal by the trial court of the indictment *with prejudice* would have been a manifest abuse of discretion. I would have refrained from doing so.

It follows from all this that Petitioners' claim of ineffective assistance of counsel, based upon a failure to move to dismiss the indictment under the Speedy Trial Act, fails because Petitioners have not shown that counsel's performance in that regard was constitutionally deficient, or that counsel's performance, even if deficient, caused the sort of prejudice to Petitioners necessary to state a Sixth Amendment claim. In *Strickland,* 466 U.S. at 700, the Court said: "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. Here there is a double failure." The same double failure is presented by this case, insofar as Petitioners' ineffectiveness claim focuses upon defense counsel's failing to seek dismissal of the indictment for violation of the Speedy Trial Act.

## 2.  Government's Trial Theories

Petitioners assert that trial counsel provided ineffective assistance by "failing to seek admission at trial of the government's theory of the charged crimes at the Padilla trial." M.B. at 79-82.

The mandate rule bars this claim of ineffective assistance. These cases have to do with the murderous, narcotics-related activities of the C&C gang. Angel Padilla was the leader of C&C. Camacho and Rodriguez were members. Padilla, Camacho and Rodriguez were among the 17 individuals charged in a 73-count indictment charging 17 individuals with participating in the C&C racketeering enterprise. Camacho and Rodriguez were severed for a separate trial. Padilla and one other defendant were tried first and convicted. Camacho and Rodriguez were then tried together and convicted. Petitioners' theory on the present ineffective assistance claim is that at the trial of Padilla, the government offered proof and argued to the jury that Padilla "had Ocasio killed" by issuing an order to that effect to gang members, but at the trial of Petitioners the government offered the testimony of Albizu "that he orchestrated the murders himself." M.B. at 80. Petitioners contend in this habeas proceeding that defense trial counsel "were aware of, or should have been aware of, the inconsistent theories and failed to request to admit the evidence of the government's former motivation theory." *Id.* at 81. Petitioners say that "any government argument that the theories were reconcilable because evidence at both trials showed that C&C members knew Padilla was angry with Ocasio, and thus was the impetus behind the murders, falls flat." *Id.* at 81.

The difficulty for Petitioners lies in the fact that their "irreconcilable theories" contention was advanced on direct appeal and the Second Circuit rejected it in *Camacho I.* The court of appeals said, in the context of asserted prosecutorial misconduct: "The defendants' contention that the government relied on 'irreconcilable theories' also fails. There is no conflict in believing that both Padilla and Albizu were motivating forces behind the murders." 187 F. App'x. at 33.

Petitioners may not agree with that rejection of their "irreconcilable theories" concept, but it is a holding by the Second Circuit on direct appeal, and it is not for this district judge to say that

36

in stating it, the court of appeals fell flat. This holding destroys, at the appellate level, this particular claim of ineffective assistance, which is nothing more than a reframing of a claim rejected on direct appeal. Petitioners cannot be heard in a habeas proceeding to say that their trial attorneys were ineffective in failing to press a theory of prosecutorial misconduct that the Second Circuit squarely rejected on direct appeal.

### 3. Government's Background Evidence

Petitioners fault trial counsel for "failing to object to the government's presentation of background evidence to the background evidence." M.B. at 82. The gravamen of this colorfully phrased complaint is that the government elicited trial testimony from a "background witness," Jose Crespo, to show "drug dealing [by Petitioners] and weapons [possessed by Petitioners] at other locations prior to arrival [by Petitioners] at C&C territory and with no relation to C&C or the charged crimes." *Id.* Petitioners now argue: "This was a deliberate introduction of unrelated, improper and prejudicial evidence and defense counsel were deficient in failing to object to its inclusion, move to strike the testimony and request for curative instructions." *Id.*

Petitioners revisit this subject when they come, in their Main Brief, to criticize the conduct of their *appellate* counsel. The Main Brief says at 131: "At petitioners' trial the government admitted [*sic*; should be "submitted"] 'background' evidence of drug dealing and weapons from petitioners' prior drug trial at *United States v. Camacho*, S2 93 Cr. 549 (JFK). Counsel on appeal argued that the District Court erred in admitting the background evidence and that it should have been excluded in its entirety," which Petitioners now say "was a losing proposition because trial courts enjoy broad discretion to decide evidentiary issues," M.B. at 132-33, a concession which pulls the rug on Petitioners' earlier argument that trial counsel erred "in failing to object to [the] *inclusion*" of this

evidence, M.B. at 82 (emphasis added). Petitioners' present contention is that appellate counsel's arguments "should not have been that the background should have been excluded in its entirety, but that it was prejudicially excessive and should have been limited to exactly what the government claimed it needed background to establish." *Id*. at 133.

What did the Second Circuit say on this subject? In *Camacho I* the court of appeals identified as the Petitioners' first contention on direct appeal: "the district court erred in admitting evidence from a prior trial of defendants." 187 F. App'x at 32-33. This is a reference to the just noted "prior drug trial" of Camacho and Rodriguez before Judge Keenan, S2 93 Cr. 549. Known as the "Black Rain" trial, this trial was the source of the evidence of drug dealing by Camacho and Rodriguez and weapons in their possession whose admission into evidence at the underlying trial before me is now asserted as a basis for habeas relief.[5] The Second Circuit rejected this argument on direct appeal:

> First, we hold that the district court did not abuse its discretion in admitting the evidence from the so-called "Black Rain" trial. The evidence was relevant under Federal Rule of Evidence 401 because its existence made more probable the material fact that defendants had an affiliation with the C&C enterprise beginning with their dealing of drugs in C&C territory. And it was not an abuse of discretion for the district court to decline to bar the evidence under Federal Rule of Evidence 403 as unduly prejudicial, especially given the district court's instructions to the jury to limit the import of this evidence.

187 F. App'x at 33 (citation and internal quotation marks omitted).

---

[5] Thus the "Black Rain" sobriquet was used by the prosecutor in rebuttal at the underlying trial, which I had occasion to quote in a post-trial opinion, 1998 WL 472844, at *11 (S.D.N.Y. Aug. 10, 1998): "Ladies and gentlemen, what about these? What are these for? These are the guns Detective Sanchez seized from Apartment 2B, the stash house for the defendants and their Black Rain heroin business, the guns that Jose Crespo said that the defendants had access to."

I conclude that the mandate rule precludes Petitioners' habeas claim based upon the admission of background evidence at their trial. On direct appeal, Petitioners specifically challenged the admissibility of the evidence generated by their earlier "Black Rain" trial before Judge Keenan. The Second Circuit, with equal specificity, rejected that challenge. The court of appeals held in *Camacho I* that the Black Rain evidence was admissible in this case for the background purposes urged by the government at trial, argued for on appeal, and reiterates on these petitions. As Petitioners' present theory evolves in its Main Brief, they contend not so much that the Black Rain evidence was totally inadmissible, but that its amount was excessive and unfairly prejudicial. One may admire the ingenuity of the argument, but it does not withstand analysis. The Second Circuit's explicit holding that *all* the Black Rain evidence was admissible for legitimate background purposes destroys the factual predicate for the habeas argument that *part* of that evidence was excessive. Again, Petitioners are indulging in the impermissible practice of reframing, as an ineffective assistance of counsel argument for habeas purposes, a theory of trial error the Second Circuit explicitly rejected on direct appeal.

### 4. Government's Closing Arguments

Petitioners fault both trial counsel and appellate counsel for ineffective assistance with respect to what Petitioners condemn as the prosecutors' "egregiously improper closing arguments" to the jury. M.B. at 83. As for trial counsel, Petitioners complain in Ground Two that their attorneys "failed to object" to each of twelve specific aspects of the government's closing summation or rebuttal: a collection that includes government arguments that Petitioners urged their alibi witnesses to lie; prosecutors misrepresented the trial testimony of certain witnesses and improperly vouched for other witnesses; prosecutors improperly denigrated defense arguments as "a fraud" and made a

"guilt by association" argument of their own; and a prosecutor committed the impropriety of "virtually testifying" in rebuttal as to "why the government had never interviewed the surviving victim."  Pursuing this subject in Ground Three, Petitioners fault appellate counsel for "failing to raise all of the government's misconduct and misstatements of the record during closing argument," *id.* at 138, and "failing to provide or cite to any case law supporting government counsel's closing statement misconduct arguments that were  made," *id.* at 140.

The thrust on this aspect of the case is that the prosecutors committed a number of improprieties during closing arguments; defense counsel rendered ineffective service by failing to object to the trial judge at the time; and defense appellate counsel rendered ineffective assistance by not raising all these issues during the appeal.

On direct appeal, Petitioners asserted prosecutorial misconduct during closing arguments as a ground for reversal.  The Second Circuit rejected the claims in *Camacho I.*  The court of appeals said: "Neither will we disturb the convictions on account of improper closing arguments," 187 F. App'x 30 at 33, and added:  "We further hold that the alleged incidents of prosecutorial vouching for witnesses do not warrant reversal."  *Id.* at 34.  The first of these holdings dealt with the prosecution's use of the word "lie" to comment on the credibility of defense witnesses; with prosecutors' asserted misrepresentation in recounting the testimony of a witness, Melendez; and with the prosecution's "use of the 'Black Rain' evidence in summation." *Id.*  The second holding dealt with cooperation and nonprosecution agreements with government witnesses Crespo, Albizu and Welch, which the Second Circuit said "were properly cited in summation. " *Id.*

It is readily apparent that the Second Circuit's holdings in *Camacho I* consider and reject a number of factual predicates for what Petitioners now characterize as instances of the ineffective

assistance of counsel, in failing to object to or appeal from prosecutors' closing arguments.  To the extent that Petitioners' habeas claims of ineffective assistance mirror claims defense appellate counsel asserted on direct appeal and the Second Circuit rejected, the claims are precluded in this proceeding by the mandate rule.  The habeas petitions may be read to include other asserted improprieties of prosecutors during closing arguments, in addition to those specifically addressed by the Second Circuit on direct appeal.  However, I think the proper conclusion for this habeas court to reach is that the mandate rule bars any claim of ineffective assistance of counsel (trial or appellate) relating to the government prosecutors' closing arguments (summation and rebuttal).

On direct appeal, appellate counsel launched a broad attack on the propriety of the prosecutors' closings, and the Second Circuit rejected every specified instance of asserted impropriety.  Those circumstances reveal the habeas claim of ineffective assistance in relation to the closing arguments as an impermissible effort to recast, reclothe and reframe a due process claim as an ineffective assistance of counsel claim.  I decline that effort, on the authority of cases like *Jones* and *Flaquer*.

If I am wrong in applying the mandate bar to the entirety of Petitioners' ineffective assistance claims with respect to the prosecutors' closing arguments, I am in any event unable to discern any deficiency in trial or appellate defense counsel's performance in that regard of such a magnitude that Petitioners' trial or appeal would have ended differently if counsel's mistake had not been made. That is the showing Petitioners must make to obtain habeas relief on the basis of constitutionally ineffective assistance of counsel.

### 5. Jose Crespo

Further to Petitioners' general claim of ineffective assistance on the part of trial counsel, their

Main Brief moves from criticizing the prosecutors' closing arguments to other incidents occurring in the district court, either during the trial or in connection with post-conviction motions for a new trial. The first of these incidents involves a government trial witness named Jose Crespo.

Jose Crespo testified at the trial of Camacho and Rodriguez as a cooperating government witness, having executed a cooperation agreement with the United States Attorney's office. Crespo had also testified in three prior criminal trials, pursuant to different cooperation agreements. Crespo's relative prominence as a government witness resulted from a criminal record involving drug trafficking and crimes of violence.

Petitioners were charged with murdering Hector Ocasio and Gilberto Garcia, and attempting to murder Luis Garcia, for the purpose of gaining entrance into the C&C criminal enterprise. The government did not call Crespo as a witness to those crimes; rather, he testified as to Petitioners' association with the C&C organization and their own activities with drugs and firearms. The prosecutors offered Crespo's testimony as background information relevant to the crimes of murder the government charged against Camacho and Rodriguez. I allowed that evidence, with limiting instructions to the jury, which are quoted in a post-trial opinion. At the beginning of Crespo's direct examination, I instructed the jury:

> This witness is describing conduct on the part of Mr. Camacho and Mr. Rodriguez and others in connection with the distribution and sale of narcotics. . . . You are hearing about this because, in this indictment before this jury, what the government charges these defendants with is belonging to and participating in the activities of that organization known as the C&C organization. You are going to hear something more about the C&C organization. What you have heard about the drug transactions engaged in by these defendants – to the extent that you accept that testimony – is offered only to provide background, an explanation, a preliminary exposition so that you may better understand events which thereafter occurred and which are

implicated by the charges that the government makes.

*United States v. Camacho*, No. S-12 94 CR. 313 (CSH), 1998 WL 472844, at *9-10 (S.D.N.Y. Aug. 10, 1998).

The separate attorneys for Petitioners cross-examined Crespo vigorously at the trial. Their objective was to denigrate Crespo's credibility in the minds of the jury. The drama of the trial played out along familiar lines. Transgressors who have been "turned" by the government, entered into cooperation agreements, and furnish that bargained-for cooperation by testifying against other individuals, are often participants in criminal trials. For an experienced defense attorney, attacking the credibility of a cooperating government witness is a frequent task. Trial counsel for Camacho and Rodriguez were experienced and able. As Petitioners acknowledge in their Main Brief at 105, "Prior to trial, counsel had in their possession all of Crespo's prior testimonies, and the testimonies were also provided along with Crespo's 5k1 letter [the cooperation agreement] and sentencing transcripts via § 3500 disclosure." Defense counsel attacked Crespo's credibility, on the basis of his cooperation agreements and prior testimony, with such asperity that the prosecutor felt it necessary to defend that credibility in his summation, later criticized by appellate defense counsel as impermissible vouching, a contention the Second Circuit rejected: "Unlike the case cited by the defendants, in which the fact emphasized in summation was not in evidence, the cooperation and nonprosecution agreements with Crespo, Albizu, and Welch were part of the record here and were properly cited in summation." 187 F. App'x at 34 (citations omitted).

In the present context of asserted ineffective assistance, what Petitioners' claim comes down to is that on cross-examination, trial counsel should have, but failed to ask Crespo about a number of aspects of his prior testimony in other trials, and the content of his cooperation agreements, which

Petitioners regard as reflecting negatively upon Crespo's credibility. The Petitioners' discussion on this aspect of the case is replete with the phrase "[c]ounsel should have also questioned Crespo" on one circumstance or another, M.B. at 104. The brief concludes: "There was no sound professional reason to not pursue the obvious questioning above. Counsel were clearly ineffective in failing to cross-examine Jose Crespo regarding these matters." *Id*. at 105.

This is not the stuff of which *constitutionally* ineffective assistance of counsel is made. An individual like Crespo, with his past criminal record, cooperation agreements, and prior testimony, presented a fertile ground for cross-examination challenging his credibility. The attorneys for Camacho and Rodriguez entered upon that ground, seeking by their cross-examination to harvest the jury's rejection of Crespo as a witness who could not be believed. While trial counsel asked some questions, and made some arguments, to that end, Petitioners contend on habeas that counsel should have asked or pursued the additional questions posed in their petition. To obtain habeas relief from their convictions on that theory of ineffective assistance, the two-component *Strickland* test requires Petitioners to show that counsel's performance in fashioning their cross-examination of Crespo was deficient, and that the deficient performance prejudiced the defense. The petitions fall short on both factors.

As to the quality of the defense attorneys' performance, I accept that they had a considerable array of possible questions to ask and issues to raise in cross-examining Crespo which bore on his credibility, and chose to ask some and not pursue others. The Supreme Court cautions lower courts in *Strickland* that "Judicial scrutiny of counsel's performance must be highly deferential," and adds: "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved

unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."" 466 U.S. at 689. The district judge evaluating a habeas petition is obligated to avoid those lures and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation and quotation marks omitted). "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. The fashioning of an adverse witness's cross-examination is a quintessential exercise of trial strategy. Extending to trial defense counsel in this case the mandated highly deferential judicial scrutiny, I am unable to conclude that counsel's trial conduct, in not asking Crespo the questions Petitioners say they should have asked, falls outside the wide range of professionally competent assistance.

As to the second *Strickland* component, prejudice to the defense caused by counsel's deficient performance, Petitioners entirely fail in that regard, even assuming, contrary to my conclusion just stated, that counsel's cross-examination of Crespo was deficient. *Strickland* held that "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." 466 U.S. at 696. In this case, the decision reached was the jury's verdict convicting Camacho and Rodriguez of the murders charged. Crespo's testimony was limited to background aspects. The direct evidence of Petitioners' participation in the crimes charged came from other witnesses. Given all the evidence in the record, there is no reason to suppose that even if defense counsel had asked Crespo the questions Petitioners say they should have asked, and as a result the jury had entirely disbelieved Crespo's testimony, the

jury would have acquitted Petitioners, rather than convicting them.

For these reasons, the actions of the trial defense attorneys in connection with the cross-examination of Jose Crespo do not give rise to a viable constitutional claim of ineffective assistance of counsel.

### 6. Defense Counsel's Summations

Petitioners' next claim of ineffective assistance by trial counsel charges these attorneys with delivering "inadequate summations" at the conclusion of the trial. Specifically, Petitioners' Main Brief contends that counsel, in summing up to the jury, should have argued more persuasively and cited available evidence in efforts to rehabilitate the testimony of Venero Jiminez, an alibi witness called on behalf of Camacho, and Nancy Melendez, an alibi witness called on behalf of Rodriguez. The government had called rebuttal witnesses to attack the credibility of these defense witnesses. In addition, Petitioners fault trial counsel for failing adequately in summation to rehabilitate the exculpatory testimony of Luis Garcia, one of the three shooting victims during the January 2, 1993 incident, who survived, appeared as a defense witness at the 1996 trial, and testified that individuals other than Camacho or Rodriguez were the shooters. The government challenged Garcia's credibility on several grounds.

The Second Circuit has said that "an incompetent summation can demonstrate ineffective assistance of counsel." *United States v. Jordan*, 927 F.2d 53, 57 (2d Cir. 1991). For that proposition, the Second Circuit cited *Matthews v. United States*, 449 F.2d 985, 987-88 (D.C. Cir. 1971). In *Matthews,* a joint trial of two defendants for armed robbery, assault and kidnaping, the D.C. Circuit condemned "the altogether casual summation" of counsel for one defendant as "constitutional error"; indeed, counsel's utterly bland statements to the jury, reproduced in footnote 3 to the court of appeals'

opinion, justified the court's criticism that "appointed trial counsel for Matthews misconceived his function as an advocate in this case." 449 F.2d at 987-88. Nonetheless, although the inadequacy of counsel's summation was sufficiently extreme to constitute "constitutional error," the D.C. Circuit did not disturb Matthews' conviction, because "other evidence strongly supported the manager's identification of Matthews" as a perpetrator, "and considering the context of the evidence as a whole rather than in its bald abstract form, while the error was constitutional, we find beyond a reasonable doubt that it was harmless." *Id.* at 988. This case illustrates the working of the two-pronged *Strickland* rule: Ineffective assistance of counsel does not render a conviction vulnerable to direct or collateral attack unless counsel's deficient performance prejudiced the defense, which is to say, that without counsel's deficiency, the result of the proceeding would have been different.

The Second Circuit is not prone to accept the assertion of a convicted defendant that his counsel's summation was not only unpersuasive but constitutionally inadequate. In *Jordan*, the court of appeals rejected criticism of defense counsel for not having delivered a second summation following the trial judge's ruling on a point of law. "Jordan's lawyer gave a satisfactory summation and cannot be faulted for declining the invitation to address the jury a second time." 927 F.2d at 57. In *United States v. Hon Yee-Chau*, 17 F.3d 21, 27 (2d Cir. 1994), the convicted defendant criticized his counsel's assistance as ineffective because of a garbled opening statement in the summation. The Second Circuit rejected the argument: "As for the summation, although an incompetent summation can constitute ineffective assistance [citing *Jordan*], counsel's 'bald eagle' comment was merely inarticulate. Counsel's argument as a whole was an effective one." *Id.*

An attorney's summation at the end of a trial is an exercise of undistilled advocacy. "[D]ecisions as to which arguments to stress, which witnesses to call, which motions to make, and

which lines of inquiry to pursue, fall squarely within the ambit of trial strategy and, if reasonably made, cannot support an ineffective assistance claim." *Figueroa v. Ercole*, 800 F. Supp. 2d 559, 568 (S.D.N.Y. 2011) (citation and internal quotation marks omitted). Because counsel's competence is presumed and the habeas petitioner must rebut that presumption, *see Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986), it follows that "[t]he *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).

Petitioners' brief argues spiritedly that counsel for Camacho and Rodriguez, in their summations, could and should have applied different nuances to aspects of the evidence they discussed, and made specific arguments about aspects of the evidence not mentioned in the summations. It is not surprising to encounter professional disagreement about what the best conceivable summation should contain, particularly when the summation as delivered failed to persuade the jury to acquit the defendant. Justice O'Connor wisely observed in *Strickland*: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689. But such criticism, however heartfelt, falls well short of demonstrating a constitutionally deficient performance by counsel. While Petitioners' present unknown advocate refers to defense trial counsel with scorn, not deference, *Strickland* commands that my "[j]udicial scrutiny of counsel's performance must be highly deferential," *id.* Trial counsel for Camacho and Rodriguez were experienced defense attorneys; their conduct of the defense cases reflected counsel's full understanding of their functions as advocates in the case; far from failing to deliver any meaningful summation whatsoever, counsel delivered vigorous summations which provoked the prosecutors into vehement rebuttals whose propriety the

Second Circuit had to consider.

Viewing trial counsel's summations with the mandated deference, I am unable to discern in them deficiencies in advocacy of a severity sufficient to fall outside the wide range of professionally competent assistance, so that these attorneys were not functioning as the "counsel" guaranteed by the Sixth Amendment.[6] I am also unable to discern any statement or omission in counsel's summations which, had they said to the jury just what Petitioners contend they should have said, would probably have resulted in verdicts of acquittal. It follows that this particular habeas claim fails both *Strickland* standards.

### 7. Defense Witnesses

Petitioners' next assertions of trial counsel ineffective assistance relate to the testimony of witnesses called by defendants. Defendants called alibi witnesses: Venero Jiminez, on behalf of Camacho, and Nancy Melendez, on behalf of Rodriguez. Petitioners claim in this habeas proceeding that counsel performed deficiently in failing to rehabilitate these witnesses after the government attacked their credibility. Camacho claims, in his petition, that his trial counsel rendered ineffective assistance by failing to prepare Jiminez, his alibi witness, and failing to call as an additional alibi witness Luisa Figueroa, Camacho's mother, a Florida resident. Petitioners also contend that counsel's performance was deficient in the preparation and rehabilitation of Luis Garcia, a shooting victim and witness who gave trial testimony exculpatory of Camacho and Rodriguez.

### a. *Alibi Witnesses*

An unoffered alibi, or an offered alibi the jury rejects, are frequent subjects in direct or

---

[6] I do not mean, by what I have said in text, to suggest that counsel committed any errors at all in their summations.

collateral attacks upon a conviction. *Newton v. Coombe*, No. 95 CIV 9437 (GEL), 2001 WL 799846 (S.D.N.Y. July 13, 2001), is such a case. District Judge Lynch (as he then was) considered a federal habeas petition following the petitioner's rape conviction in a state court. Petitioner, the defendant Newton, claimed that his trial counsel was constitutionally ineffective

> in failing to prepare petitioner's two alibi witnesses, his girlfriend and her thirteen-year old daughter, to testify, with the result that the daughter testified that petitioner was home watching television with her and her mother on the night of June 23-24, 1984 – when the crime had actually occurred on the night of June 22-23, 1984.

2001 WL 799846, at *4. Her mother testified that petitioner "had slept with her and was present all night" on the night of the crime; and the date of a television program's showing that both witnesses testified everyone watched "permitted the argument that the daughter's testimony, while mistaken as to the day of the week, in fact corroborated rather than contradicted her mother's testimony." *Id.* at *4-5.

Judge Lynch's instructive opinion addressing the constitutional dimensions of these circumstances is worth quoting at some length:

> To establish ineffective assistance of counsel, a petitioner must establish both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). On the first prong, it is certainly troubling that the alibi witnesses testified inconsistently. If they did so as a result of poor preparation by defense counsel, that would raise a serious question about counsel's effectiveness. Thorough investigation of the facts, including interviewing any potential witnesses, is a basic requirement of competent attorney performance, and putting a witness on the stand without adequate preparation would fall below a minimum standard of professional practice. . . . It may be that counsel, after adequately interviewing the witnesses, could reasonably have decided to forego an effort to correct minor inconsistencies in witnesses' testimony in the belief that such errors would enhance the witnesses' credibility by making their

50

> testimony appear spontaneously honest rather than rehearsed. . . . But no lawyer could make a "strategic" decision not to interview witnesses thoroughly, because such preparation is necessary in order to know whether the testimony they could provide would help or hinder his client's case, and thus is prerequisite to making any strategic decisions at all.

2001 WL 799846, at *5.  Judge Lynch was not able in his habeas review to pursue "[t]he causes of the confusing testimony" because the trial record "contains no evidence of what the witnesses now claim to have been the truth, what they told defense counsel before trial, or how they were interviewed or prepared by counsel."  *Id.* at *6.

Judge Lynch then turned to the second *Strickland* component:

> Even if an evidentiary hearing revealed that trial counsel had failed to take basic steps to prepare the witnesses, however, petitioner would still have to satisfy Strickland 's second prong, by establishing that counsel's deficient performance deprived him of a fair trial. To meet this standard requires a showing that, but for counsel's errors, there is a reasonable probability – "a probability sufficient to undermine confidence in the outcome" – that the result of the trial would have been different. 466 U.S. at 694.

*Id.*  Judge Lynch concluded: "This standard petitioner cannot meet," principally because "[t]he evidence against Newton was extremely strong."  *Id.*  In that regard, Judge Lynch referred to the testimony of the rape victim and a bodega clerk of her acquaintance.  The victim identified petitioner as the perpetrator.  The clerk identified him as present, in the victim's company at a pertinent time and place.

Having studied the trial evidence, Judge Lynch observed that in view of the inconsistencies concerning dates and times, the daughter's testimony "cast doubt on her mother's alibi evidence," *id.*; but the resulting complications for the defense did not implicate the Sixth Amendment's Assistance of Counsel Clause.  On that point, Judge Lynch reasoned:

The defense would probably, on balance, have been better off without the daughter's testimony, but a conscientious review of the testimony and arguments does not come close to producing a conclusion that without her testimony, there is any reasonable likelihood that the result of the trial would have been different. Since petitioner cannot demonstrate that better preparation of the witnesses would have had a "reasonable probability" of changing the result, his claim of ineffective assistance of counsel must be rejected.

*Id*. at *7. The petitioner's inability to demonstrate a reasonable probability of an acquittal stemmed from what Judge Lynch referred to as "the affirmative evidence in the case," *id.*, principally the testimony of two on-site witnesses identifying the defendant as the perpetrator, evidence the jury was entitled to accept.

*Newton* and this case resemble each other. In each, there was no question a crime had been committed in New York City: a rape in *Newton,* the shootings in this case. The defense in each case was that the defendant did not commit the crime because at the time he was somewhere else: Newton with his girlfriend in the City; Camacho in Florida; Rodriguez with his girlfriend in the City. Each defendant called witnesses at trial to prove those alibis. Each alibi failed. The jury convicted each defendant of the crime charged. Each defendant asserted in subsequent habeas proceedings that his alibi was compromised by defense counsel's deficient performance in presenting it. In *Newton,* that habeas claim failed for the reasons stated in Judge Lynch's opinion. The question in this case is whether the constitutional habeas claim of Camacho or Rodriguez fares any better.

### i.    Camacho's Alibi

The shootings of Ocasio and the Garcias occurred on a Bronx sidewalk during the night of January 2, 1993. Camacho's alibi is that on that date he was in Orlando, Florida, visiting his mother, Luisa Figueroa. To establish that alibi, Camacho called as a witness Venero Jiminez, a friend and

neighbor of Figueroa. Jiminez testified that he first met Camacho when, about three days after Christmas in 1992, he and Figueroa drove from Orlando to the Bronx to pick up Camacho and Figueroa's infant granddaughter, returning at once to Florida. On direct examination by defense counsel, this exchange occurred:

> Q.  Do you know if there came a time when he [Camacho] returned to New York?
>
> A.  Yes, I learned of it through his mother.
>
> Q.  Do you know about when it was that he returned to New York?
>
> A.  About three weeks later.

Trial transcript ("Tr.") at 1499 (Ex. D to Petitions). The government did not object to the hearsay nature of the mother's declaration about the timing of Camacho's return to New York. Instead, the prosecutor returned to that subject during cross-examination of Jiminez, when he testified:

> Q.  After you all parted upon your arrival in Orlando, did you have occasion to see Steven [Camacho] again?
>
> A.  From my porch, I would see him, yes.
>
> Q.  Do you know when Steven left Orlando?
>
> A.  Well, according to his mother, who told me because I asked her, about three weeks later.
>
> Q.  In that three weeks, how many times would you say you saw Steven, Mr. Jiminez?
>
> A.  About ten times.
>
> Q.  Do you recall the last time it was that you saw Steven?
>
> A.  Two days before he left.

> Q. Do you recall that specific date?
>
> A. No.
>
> Q. Do you recall what he was doing when you saw him?
>
> A. He was always at home.

Tr. at 1506.

The case for Camacho is that since he was in Orlando for three weeks after his arrival there three days after Christmas in 1992, he could not have been on the Bronx street on January 2, 1993, where and when the charged shootings occurred.

To rebut that alibi, the government called a New York parole officer, Carol Skinner. At the times in question, Camacho was serving a term of New York State parole after serving his sentence in an unrelated state case. Skinner supervised Camacho's case between August 1992 and July 1993. She met with Camacho once a week in her Bronx office. Skinner testified that she met with Camacho in that office on December 23, 1992, and again on January 6, 1993. She testified further that Camacho was not permitted to travel outside of New York State without her permission, and that she did not grant Camacho permission to leave the state in either December 1992 or January 1993. The government argued to the jury that in the light of Skinner's testimony, the jury should reject the testimony of alibi witness Jiminez, to the extent that his testimony was offered by the defense to prove that Camacho was in Orlando, Florida on January 2, 1993.

As noted, the case for the defense is that Camacho went to Orlando in December 1992 to visit his mother, Luisa Figueroa, and stayed there with her through January 2, 1993. Trial counsel for Camacho, opening to the jury at the beginning of the trial, said: "The witnesses for the alibi defense are his mother and a friend of his mother's. His mother's name is Luisa Figueroa." M.B. at 117

(quoting trial transcript at 29).  The defense did not call Figueroa as a witness at the trial in June of 1996.  The record of these habeas proceedings includes an affidavit (Ex. M) executed by Figueroa on May 24, 2014.  This affidavit was prepared to support the present habeas petitions; its caption refers to Camacho and Rodriguez as "Petitioners" and the United States as "Respondent."

Figueroa states in her affidavit that she is the mother of seven children.  Steven Camacho is one of them.  In "early to mid 1992," Figueroa moved from New York to Orlando, Florida, taking most of her family with her.   Steven was incarcerated at that time.  Aff. ¶¶ 2, 3.  Camacho was released from prison in the summer of 1992.  Figueroa asked him "to come live with us in Florida," but Camacho explained that his parole status in New York prevented him from moving.  Aff. ¶ 4.  Camacho visited Figueroa in Orlando several times; Figueroa's affidavit says on that score:

> 6.  I recall Steven staying with me at my home in Orlando, Florida, on three occasions for about a week each time.
>
> 7.  For Steven's first visit, Venero Jiminez and I made a trip to New York and personally picked up Steven and one of my grandchildren, and drove them to Florida in the week between Christmas of 1992 and New Years of 1993.  Steven left by bus about a week later.

On the subject of her possible testimony at the trial in 1996, Figueroa says that she spoke "to Steven's attorney a few times over the phone and at least once in person"; at the time of those conversations "my english [sic] was very broken (and still is)"; and the attorney "told me I would probably need an interpreter if I were to testify."  Aff. ¶¶ 9, 10.  Figueroa states further:

> 11.  I recall telling Steven's attorney that Steven was with me at my home in Florida on three separate occasions for about a week each time.  I described the circumstances of Steven's first visit, that Steven was with me for New Years of 1993, and that Venero Jiminez could also verify that Steven was in Florida for the 1993 New Years.

12.      I recall Steven's attorney asking me to see if Venero Jiminez would be willing to testify.

13.      I asked Venero Jiminez to testify for Steven because he knew Steven was in Florida from just after Christmas 1992 until sometime after New Years 1993.

Figueroa's affidavit also describes this pre-trial exchange she had with Jiminez:

14.      I am aware that Venero Jiminez testified that I told him Steven stayed in Florida for about three weeks. Before he testified, I recall him asking me how long Steven stayed in Florida and I may or may not have told him three weeks. If I did, it was in reference to the three separate weeks that Steven stayed in Florida with me.

Camacho contends in this habeas petition that his trial attorney rendered ineffective assistance in the matter of the alibi defense by failing to call Figueroa as an alibi witness, and improper preparation of Jiminez, the alibi witness who did testify.

As for defense counsel's failure to call Figueroa , the question posed under the *Strickland* rule is whether, to paraphrase Judge Lynch in *Newton,* I am able to conclude that "*with* her testimony, there is any reasonable likelihood that the result of the trial would have been different." I am entirely unable to reach that conclusion. The question is not close. There are several reasons.

First, if Figueroa had testified, it is likely that her testimony would have undermined the alibi argument counsel was able to make on Camacho's behalf based on the testimony of Jiminez alone. Jiminez testified that he helped Figueroa drive Camacho from New York to Orlando about three days after Christmas in 1992, and that Figueroa told him Camacho stayed in Florida until he returned to New York "about three weeks later." That anticipated testimony allowed counsel to say to the jury in his opening statement that Camacho's mother and her friend "came to New York before New Years . . . going into January 1993. They go with him back to Florida, *a couple of weeks into*

56

*January 1993*. He returned to New York." Tr. 29 (emphasis added). A three-week stay in Florida by Camacho, beginning three days after Christmas, would render impossible his presence in New York on January 2: the very essence of an alibi defense. The problem is that Jiminez's testimony makes clear he had no personal knowledge of the date on which Camacho returned to New York; Jiminez's declaration that this occurred "about three weeks later" depends entirely on what Figueroa told him; and Figueroa's affidavit makes it equally clear that Jiminez misunderstood what Figueroa told him. Figueroa acknowledges the possibility that she told Jiminez that Camacho stayed in Florida for "three weeks," but if she did, "it was in reference to the three separate weeks that Steven stayed in Florida with me," Aff. ¶ 14, the second and third trips having occurred "in the spring and summer of 1993." Aff. ¶ 8. The strongest version of an alibi to which Figueroa would have testified is revealed by her affidavit at ¶ 7: she and her friend "picked up Steven and one of my grandchildren, and drove them to Florida in the week between Christmas of 1992 and New Years of 1993. Steven left by bus about a week later." This reduced time frame might have allowed Camacho to be back in New York by the close of day on January 2, 1993; it might not have done so; but the point is that with respect to this crucial temporal aspect, Figueroa's testimony at trial would have significantly undermined the time frame that defense counsel, armed only with Jiminez's testimony, urged in support of Camacho's alibi theory. Thus it cannot be said that Figueroa's testimony would have increased the likelihood of Camacho's alibi defense succeeding. The contrary is true.

Second, there are discernible reasons why Camacho's attorney may have chosen to present an alibi defense through the testimony of Jiminez alone. As noted by Judge Lynch in comparable circumstances, an alibi witness's testimony is weakened "by the bias resulting from her loving relationship" with the defendant, *Newton*, 2001 WL 799846, at *7. In this case, the loving

relationship between Figueroa and Camacho was that of mother and son; Jiminez had no such relationship with Camacho; Jiminez was in a position to describe Camacho coming to Orlando for a visit; and Jiminez's testimony about when Camacho left Orlando, as it emerged, was more favorable to the alibi defense than Figueroa's probably would have been. Figueroa says in her affidavit at ¶ 15 that "I do not recall why I was not called to testify on Steven's behalf." Camacho's attorney had spoken to Figueroa a number of times, and clearly decided not to call her as a witness, preferring instead to use Jiminez as the alibi witness. That is the sort of tactical decision by a trial attorney to which a habeas judge owes deference. I am not persuaded that, in the circumstances of the case, counsel's actions amounted to deficient performance.

Third, the likelihood of Camacho's alibi defense succeeding if Figueroa had testified, in a manner consistent with her affidavit, must be evaluated in the light of the government's evidence identifying Camacho as a participant in the January 2, 1993 Bronx shootings. "Viewing the trial transcript as a whole," Judge Lynch said in *Newton*, "I cannot conclude that there is a 'reasonable probability' that the result of the trial would have been different if counsel had identified the problem with the daughter's testimony and decided not to call her. The evidence against Newton was extremely strong." 2001 WL 799846, at *6. In this case, the government called as witnesses James Albizu, a C&C member, and Douglas Welch, a livery car driver, who testified at length about the presence of Camacho and Rodriguez at, and their participation in, the January 2 shootings of Ocasio and the Garcias. The Second Circuit cited their testimony in rejecting the Petitioners' claim on direct appeal of insufficient evidence:

> The defendants do not contend that Welch's and Albizu's testimony standing alone is insufficient to sustain the verdict; rather, they argue that no rational jury could have believed these prosecution witnesses

over the defense witnesses. We disagree. The government offered at trial plausible explanations for the discrepancies in Welch's and Albizu's testimony, and a rational jury could find defense witness Luis Garcia's testimony internally contradictory, implausible, and therefore unbelievable. Because a rational jury could believe the prosecution witnesses and not the defense witnesses, we honor the jury's resolution of the weight of the evidence.

*Camacho I*, 187 F. App'x at 35.

In the present context, the question is whether calling Figueroa as an additional alibi witness for Camacho would have caused the jury to disbelieve the testimony of Albizu and Welch, rather than accepting that testimony, as the jury clearly did. There is no basis upon which I could reach that conclusion. I reject Camacho's claim that ineffective assistance of counsel with respect to his alibi defense entitles him to habeas relief.

### ii.    Rodriguez's alibi

Rodriguez's alibi witness at trial was Nancy Melendez. When she testified in 1996, Melendez was 28 years old, an unemployed single mother of three sons, one of whom (age two) was Rodriguez's son.

According to her testimony, Melendez met Jaime Rodriguez during the summer of 1991. They started going out together in November of 1991, and began living together in May of 1992, in an apartment on Hull Avenue, the Bronx.[7]

On December 31, 1992, New Year's Eve, Melendez was at home with her oldest son. Rodriguez was not with her that night. At about 6:00 or 7:00 p.m, on January 1, 1993, New Year's Day, Rodriguez returned to the Hull Street apartment. He spent the night there. Melendez arose at

---

[7] The discussion in this sub-Part is based upon the transcript of Melendez's trial testimony, Ex. E to the Petitions.

about 12 noon on January 2. Rodriguez and Melendez watched a TV movie together. At about 4:00 or 5:00 p.m., Rodriguez went out to get some Chinese takeout food, returning with it 20 minutes later. Rodriguez and Melendez watched more movies. Rodriguez did not leave the apartment again during January 2, 1993. Melendez testified on cross-examination that Rodriguez "stayed all day at home because he wasn't, all day, with me for my birthday and New Year's Eve. So January 2 he spent the whole day with me to make it up for me." Tr. 1550.

Luis Garcia, a survivor of the shootings in question called by the defense as a witness, testified that during the evening of January 2, 1993 he was returning home from the neighborhood. Garcia phoned his wife at "about maybe like a quarter to eight. It couldn't have been no later than I would say ten after eight." Tr. 1600-01. Garcia stepped into a liquor store to make a purchase, and was shot in the back while on the street corner. The prosecutor, cross-examining, asked: "Do you remember what time of day it was when you were shot?" Tr. 1612. Garcia answered: "I don't know the exact time, but I know it was between maybe 8:10, 8:30, somewhere around there." *Id.* The alibi defense for Rodriguez, based upon the testimony of Melendez, is that at that time on that date, Rodriguez was with Melendez in her Hull Avenue apartment.

Melendez testified further that her relationship with Rodriguez ended by mutual consent in June of 1993. Melendez moved with her children to Lancaster, Pennsylvania, where she was living at the time of the trial in 1996. Melendez kept in touch with Rodriguez, visiting him about six times since June 1993, and speaking to him on the phone "[f]airly regularly." Tr. 1541.

With respect to Melendez's contacts with Joyce London, trial counsel for Rodriguez, the prosecutor broached that subject during his cross-examination of Melendez. These exchanges took place:

60

Q.      When was the first time you spoke to Ms. London, the lawyer
        who just asked you some questions?

A.       December of 1995.

        (Objection made and next question rephrased.)

Q.      Is it your testimony that you first spoke to Ms. London in
        1995?

A.      That I remember, yes.

Q.      And that's December 1995?  Is that what you said?

A.      Yes.

Q.      Had you spoken to her before that time, that  you recall?

A.      Yes.

Q.      When was it that you first spoke to her?

A.      1994.

Q.      And when was the first time that you met with Ms. London?

A.      In December 1995.

Q.      When is the first time that you told Ms. London that Mr.
        Rodriguez was home with you on January 2, 1993?

A.      December 1995.

Q.      December 1995.  And is it correct, Ms. Melendez, that you
        and Jaime spoke about the fact that he was home with you
        before you ever spoke to Ms. London about it, is that correct?

A.      Yes.

Q.      And you had spoken to Jaime about it in 1994 or early 1995,
        is that right?

A.      Yes.

Tr. at 1542-44 .

Also on cross-examination, Melendez described conversations she had with Rodriguez about the events of January 2, 1993.  She gave this testimony:

> Q.    And had you spoken to Jaime about it in 1994 or early 1995, is that right?
>
> A.    Yes.
>
> Q.    And did Jaime say, "Remember, what we did on January 2, 1993?
>
> A.     No.
>
> Q.    How could you recall the first time you spoke about the events of that day with Jaime?
>
> A.    He told me about the charges, and he asked me, because would I testify for him in court. –
>
> Q.    And you said you would, correct?
>
> A.    Yes.
>
> Q.    It is after you said that you would testify that you talked about what happened on January 2, 1993, is that right?
>
> A.     No.
>
> Q.    When was the first time you and Jaime discussed what you did on January 2, 1993?
>
> A.    1994, I believe.
>
> Q.    Was it before he told you about the charges or after?
>
> A.    Before.
>
> Q.    It was before.  And what was the conversation that brought up the issue of January 2, 1993, if he had not been charged in this case, yet?

A.    Because we were remembering it was my birthday.

Q.    You were reminiscing and talking about times you had?

A.    Yes.

Q.    And you spoke about January 2, 1993 because that was an important day for you, right?

A.    Yes.

Tr. at 1544-45.

Unlike Camacho in his habeas petition, Rodriguez does not assert as an ineffective assistance claim against *his* trial attorney the criticism that counsel should have called an additional witness to support Rodriguez's alibi for the events of January 2,1993. Rodriguez's ineffective assistance claim on this aspect of the case is that counsel's performance was deficient in failing to support the credibility of Melendez, the alibi witness who was called, the government having argued in its summation that Melendez's testimony was fabricated. Petitioners' Main Brief says at 111: "Counsel's ineffectiveness in failing to correct the record and support Melendez with the record was manifest in that it allowed the government to continue calling her a liar with its manipulative arguments in rebuttal."

Several instances of this perceived failure on counsel's part are cited. In summations (main and rebuttal), the prosecutors argued, contrary to the record, that Melendez should be disbelieved because it was not until December 1995 that she told London, Rodriguez's attorney, about the events of January 2, 1993, a time gap consistent, in the government's view, with a post-charge fabrication. The prosecutors also argued that during her testimony, Melendez minimized her awareness of Rodriguez's involvement with drugs and guns during the time they were living together in the Bronx.

Rodriguez asserts in his habeas petition that each of these challenges by the government to Melendez's credibility distorted and manipulated her testimony, an assertion Rodriguez bases upon quotations from and citations to the trial record. The Petition's Main Brief at 88 sums up the pernicious effect of the government's approach and defense counsel's deficient response to it: "These misstatements and misrepresentations of the record and evidence were so effective that the jury totally disregarded the testimony of Jiminez and Melendez during its deliberations"; and "[c]ounsel were clearly ineffective in failing to object, and seek corrective measures, to the government's misrepresentations of the alibi witnesses[' ] testimony and evidence and the improper arguments based on those misrepresentations." M.B. at 88.

In the present context of a claim of *constitutionally* ineffective assistance of counsel, these contentions by Rodriguez with respect to his alibi witness, Melendez, fall short. As for the timing of Melendez's communications with attorney London, the habeas petition focuses particularly upon Melendez's testimony that she first "spoke" to London in 1994. That statement does not undermine the government's argument, since it was followed immediately by Melendez's testimony that she first "met with" London in December 1995, and she and Jaime had discussed his whereabouts on January 2, 1993, before Melendez said anything to London on that subject. The prosecutor, summing up, did not need to misrepresent or manipulate Melendez's testimony in any way in order to argue that Rodriguez and Melendez concocted a false alibi which Melendez conveyed to London in December 1995. The Court does not, and need not, say this is what occurred. It is sufficient for present purposes to conclude that the government was entitled to make the argument, and defense counsel cannot be faulted for failing to object to it. The other points at issue – Melendez's familiarity with Rodriguez's drug trafficking and gun possession, contended for by the government in summations

64

– were fair inferences from the record, given the intimate relationship between Melendez and Rodriguez and their cohabitation at the relevant times.

In short, Rodriguez does not show on this habeas petition that his trial attorney's performance in presenting his alibi defense was deficient in the sense contemplated by the first prong of *Strickland*. Alternatively, the petition fails the second *Strickland* prong, since it cannot be said that absent any discernible error by counsel on this aspect of the case, the jury would probably have acquitted Rodriguez. In a striking overstatement, Petitioners' brief contends that owing to trial counsel's ineffectiveness, the prosecutors were allowed to get away with misstatements and misrepresentations so effective "that the jury totally disregarded the testimony of Jiminez and Melendez during its deliberations." Only the jurors know what they said or did not say during their deliberations. All the rest of us can say with any degree of confidence is that the jury, in considering Rodriguez's whereabouts and activities during January 2, 1993, chose to believe the prosecution witnesses (Albizu and Welch) and not the defense witness (Melendez). A rational jury could make that choice, which was neither procured nor tainted by a deficient performance of constitutional proportion on the part of trial counsel.

**b.    *Exculpatory Witness***

The exculpatory witness involved in Petitioners' claim of ineffective assistance of counsel is Luis Garcia. Garcia was wounded during the January 2, 1993 shootings, survived, and was called as the last defense witness at the 1996 trial. Both Camacho and Rodriguez rested their cases at the conclusion of Garcia's testimony.

For the sake of this discussion, it is necessary to revisit the murderous events of January 2, 1993. Petitioners and the government agree that during the night of January 2, 1993, Hector Ocasio

(a/k/a "Neno"), Gilberto Garcia (a/k/a "Tablon"), and Luis Garcia were in or near a liquor store on a street in the Bronx. Shootings occurred. Ocasio and Gilberto Garcia were killed . Luis Garcia was wounded, survived, taken to the hospital, and later discharged. The parties further agree that there were two shooters, and that one was a man named Trumont Williams (a/k/a "Tree"). The identity of the second shooter was disputed. The government charged Steven Camacho with being the second shooter. Camacho was convicted after trial. Rodriguez was convicted of participating in the shootings. The case for the defense was that the second shooter was a man named Gregory Cherry (a/k/a "Ninja").

Luis Garcia was called by Camacho as a witness at trial. He testified that as he was walking into a liquor store on 142nd Street in the Bronx, he saw "two gentlemen there that I know" standing outside the liquor store. Tr. 1601. One was Neno (Ocasio), the other was Tablon (Gilberto Garcia). Luis Garcia testified on direct examination by counsel for Camacho:

> A.    . . . .[B]efore I went to the liquor store I stopped and I said hi. And I was standing there like I would say maybe like 60 seconds, and all of a sudden I felt like somebody hit me with a sledgehammer on my back on my ribcage, and as I was hit, I turned around slightly and I hit the floor.
> . . . .
>
> Q.    Now, Mr. Garcia, as this was happening, did you have an opportunity to see who was firing the weapons?
>
> A.    Okay, when I got shot, like I said, it felt like somebody hit me with a sledgehammer, so I kind of like twist and I look back because I wanted to see who was doing the shooting. And that's when I seen Tree shooting me and Ninja, and the other guy got shot, the big guy, Tablon, got shot. I got shot first. The big guy got shot and then turned a corner like to run around the corner, and then the other guy ran after him. I didn't see him anymore. And then, meanwhile, I hit the floor and Tree was shooting Neno. He kept shooting him, and I

66

> kept feeling the rounds falling behind – the shells falling
> behind my neck.
>
> Q.    Do you know who shot you?
>
> A.    Yes.
>
> Q.    Who?
>
> A.    Tree.
>
> Q.    Do you know who shot Neno?
>
> A.    Yes, Ninja.
>
> Q.    Do you know who shot Tablon?
>
> A.    Ninja.

Tr. 1601-02, 1603.

Neither defense counsel on direct examination nor the prosecutors in cross-examining followed up on the seeming inconsistency in this passage from Luis Garcia's testimony: Garcia said that as he fell, "Tree was shooting Neno," but two questions later, when asked "who shot Neno," Garcia answered: "Ninja." In any event, the defense theory was that "Ninja" (Gregory Cherry), and not Steven Camacho, was the second shooter accompanying "Tree" (Trumont Williams). Defendants offered this testimony by Garcia to prove that theory.

The focus of the prosecutor's cross-examination of Luis Garcia was to challenge the credibility of his identification of the shooters, particularly the second shooter. Garcia testified on cross-examination:

> Q.    Mr. Garcia, when you fell down after you were shot, how long
> did you get to look at the people who were shooting? How
> much time passed before they went away?

A.    I can't recall because I started bleeding out of my mouth.  I started losing a lot of blood and everything was like real blurry and I kind of passed out like – I kind of like  – I was like going in an out.  I was like passing out, coming back, like that.

Q.    How much time do you think you had to get a look at who was shooting you?

A.    The only time I seen it was when I got shot.   When I hit the floor, I was face down, and all I can remember and feel was the rounds hitting me in the back of my neck.

Q.    Isn't it a fact that you got shot and you fell right away?

A.     Yes.

Q.     And isn't it a fact that only seconds passed before the other shooting stopped?

A.    I don't know.

Q.    How long do you think it was before the shooting stopped?

A.    To me, it felt like a long time.

Q.    But you're not sure, right, because things got blurry, didn't they?

A.    Right.

Q.    Isn't it a fact that you only saw the shooters for a few seconds?

A.    Yes.

Q.    Now, as you were falling down on the ground, what part of Ninja did you see?

A.     His side.  Like before I hit the floor, he ran after the other guy this way, like towards the corner, and it was sideways.

Q.    Was he still shooting at that time when you saw his side?

A.    No.

Q.    Did you actually see him shooting at you?

A.    No.

Q.    Did you see him shooting at anybody else?

A.    Well, as soon as he turned the corner, that's when I heard the shots.  But I didn't actually see anything.

Q.    You never saw Ninja fire a gun, is that right?

A.    No.

          . . . . .

Q.    Mr. Garcia, isn't it a fact that after you were shot, things got blurry and you only saw people behind you for a second?

A.    Yes.

Q.    And isn't it a fact that you just got a glimpse of those people?

A.    What people?

Q.    Who were shooting?

A.    The only time I seen the people that were shooting me was, after I got shot, like I said, I turned slightly and I fell to the floor.  That was the last time I saw them.

Q.    How long did you see them?

A.    I wasn't counting.  I don't know.

Q.    You got a glimpse, isn't that right, Mr. Garcia?

A.    Yes, I just got a glimpse when I turned around and I hit the floor.  That's all I remember.

Tr.  1628-30, 1631-32.

Counsel for Rodriguez thereupon elicited this testimony from Garcia:

Q.      As you turned around, did you see Tree?

A.      Yes.

Q.      And you knew Tree?

A.      I didn't know him personally, but I know who he is.

Q.      You recognized him?

A.      Yeah.

Q.      And as you turned around, did you also see Ninja?

A.      I seen Ninja running towards the corner after Tablon. That's all I seen of Ninja.

Q.      Was it a long period of time before you heard more shots?

A.      No.

Q.      Was it right away?

A.      Yes, it was pretty right away.

Q.      And as you saw that happen, did you believe that it was Ninja who was shooting Tablon?

A.      Yes.

Q.      Had you seen anything in Ninja's hand as he chased Tablon around the corner?

A.      No.

Tr. 1633.

Thereupon the prosecutor cross-examined Garcia further:

Q.      Now, after you were shot, you testified that you got a glimpse of the people that shot, right?

A.      Yes.

Q.      And you believe that the people who were shooting at you and the others were a tall black male and a Hispanic male who is a little shorter than you, is that correct?

A.      Yes.

Q.      But you didn't see the face of either of them, is that right?

A.      I seen Tree's.  I seen Ninja's briefly.

Q.      And you saw Ninja's from the side, isn't that right?

A.      From the side, yes.

Q.      And from looking at his side, you believed it was Ninja, is that right?

A.      Yes.

Tr. 1638-39.

On this habeas petition, Camacho and Rodriguez interpret Luis Garcia's testimony as saying that "Williams [Tree] shot him and Cherry [Ninja] shot the other two men."  M.B. at 6.  The brief at 28-29 spells out Petitioners' scenario of events in greater detail.  According to Petitioners, Luis Garcia's testimony establishes that "after Williams shot him, Williams continued to shoot at someone else while standing at his side," that the gun that shot Luis Garcia  "also shot someone else, most likely Gilberto Garcia (Tablon) who was shot right after Luis Garcia"; and, also according to Luis Garcia's testimony, "Tablon (Gilberto Garcia) was shot right after him and turned to run around the corner and he saw Cherry running around the corner after Tablon and then heard shots"; and, as Luis Garcia "saw that happen he believed it was Cherry who was shooting Tablon."

That has been Petitioners' interpretation of the evidence throughout the litigation.  In this

Court's opinion denying Petitioners' initial motion for a new trial on the ground of insufficiency of evidence, I said:

> There were also ample grounds for the jury to discredit the testimony of defendants' witnesses. Luis Garcia's testimony, for example, was subject to substantial challenge. After being shot in the back, Garcia fell to the ground and effectively lost consciousness. Tr. 1600-02, 1628. Garcia subsequently told the police on two separate occasions that he had not been able to identify who had shot him. Tr. 1600-02, 1628. Nevertheless, Garcia testified at trial that he knew that Williams had shot him and that Gregory Cherry had shot Hector Ocasio and Gilberto Garcia. Tr. 1602-03.

1998 WL 472844, at *4 (S.D.N.Y. Aug. 10, 1998).

Petitioners pressed this issue on direct appeal, as part of an insufficiency of evidence claim. Camacho's brief to the Second Circuit, No. 00-1288(L)-cr, at 36, contains the flat assertion: "Garcia testified that he had an opportunity to observe the shooters, both of whom he recognized. He identified the two shooters as Williams and Cherry." Garcia's "opportunity to observe" Cherry might have been compromised by the fact that when Garcia says he first observed Cherry ("Ninja") on the scene, Garcia had been shot in the back, fallen to the floor, and was losing consciousness. In any event, the Second Circuit rejected the proposition, holding that "a rational jury could find defense witness Luis Garcia's testimony internally contradictory, implausible, and therefore unbelievable." 187 F. App'x at 35.

It is arguable that given this procedural history, a habeas claim of ineffective assistance related to Luis Garcia's exculpatory testimony at trial is precluded by the mandate rule. But I do not decide the issue on that basis because the claims in question are of differing natures. On direct appeal, presenting an insufficiency of evidence claim, the Second Circuit had to decide what a

rational jury could make of Garcia's testimony on the evidentiary trial record before it. On these habeas petitions, presenting ineffective assistance of counsel claims, I must decide whether defense counsel's deficient performance deprived Petitioners of the benefit that, absent counsel's errors, the Luis Garcia testimony would otherwise have conferred upon defendants: that is to say, what a jury would have done on a *different* record. I think the better course is to consider this habeas claim on the merits.

Having considered the matter, I conclude that there is no substance to this ineffective assistance claim. Petitioners include the Luis Garcia testimony in a broad contention that "counsel provided ineffective assistance in failing to object to any aspect of the government's egregiously improper closing arguments." Main Brief ("M.B.") at 83. As to Garcia, the particular criticism Petitioners make about the prosecutor's summation is that the government "supported its argument that Garcia was mistaken by misleading the jury and manipulating the record in falsely stating that Garcia was 'flatly contradicted' by ballistics evidence and even mocked his testimony using that argument." M.B. at 112. Petitioners' ineffective assistance claim is that trial counsel "failed to highlight that the government misrepresented Garcia's testimony as 'flatly contradicted' by the ballistics evidence."

The ballistics evidence at the trial was given by NYPD detective Tota, called by the government as a ballistics expert. Petitioners' Main Brief, at 27-28, without contradiction by the government, gives this summary of Tota's ballistics evidence:

> 15 shell casings recovered at the scene (establishing that at least 15 shots were fired) were fired from two different guns. Four casings came from one gun and the other 11 were fired from another. From the autopsies and the bullets recovered from the victims it was determined that Gilberto Garcia was shot twice and Luis Garcia once

73

with the same gun, and Hector Ocasio was shot four times with another gun.

During summations, the prosecutor referred to Luis Garcia's testimony that "Tree shot him and that Ninja shot Neno [Hector Ocasio] and Tablon [Gilberto Garcia]." Tr. 1780. The prosecutor then made this argument:

> . . . You know that is an overreach, not really because it is incredible based upon what he has seen, but because his conclusion is flatly contradicted by the ballistics expert testimony in this case.
>
> Again, remember, Luis Garcia told you that Tree shot him and Ninja shot Neno and Tablon. Remember, Detective Tota told you that the same gun that shot Gilberto Garcia, Tablon, is the same gun that shot Luis Garcia. In other words, the marks on the bullets from Gilberto Garcia's body match the bullets recovered from Luis Garcia at the hospital. So unless Ninja and Tree traded guns during the shootout, Luis Garcia is just plain wrong about who shot who – just as he is plain wrong about the identity of the male Hispanic that he saw eight to ten feet away turning around the corner as he was about to lapse into unconsciousness.

Tr. 1780-81.

Petitioners profess outrage at the prosecutor's declaration that Luis Garcia's identification of the shooters is "flatly contradicted" by this ballistic evidence. Petitioners argue that "Garcia's testimony establishes that the gun that shot him also shot someone else, most likely Gilberto Garcia (Tablon) who was shot right after Luis Garcia, exactly matching the ballistics evidence." Petitioners continue: "The government misrepresented Garcia's testimony as 'flatly contradicted' by ballistics evidence and selectively highlighted an incomplete and inaccurate portion to support this false argument while avoiding the detailed and accurate testimony that proves it false," leading to the conclusion "that this false testimony was accepted by the jury is established by the fact that it declined to even review Garcia's testimony during deliberations – a total disregard for a

victim/witness'[s] testimony." M.B. at 29. These circumstances have ineffective assistance implications because, Petitioners argue in that section of their brief, at 84: "Defense counsel were clearly ineffective in failing to object, and seek curative measures, to the government's misrepresentation of Garcia's testimony, or expose the falsity of the government's arguments during the defense's own summation."

There is less to this than meets the eye. The ballistics evidence in the case is of limited nature. It tends to prove certain relevant facts, but does not prove others. Thus the ballistics evidence establishes that Luis Garcia and Gilberto Garcia (Tablon) were shot by the same gun; and, since everyone seems to agree that only Williams (Tree) shot Luis Garcia, and Gilberto Garcia was shot immediately after Luis Garcia, it is a fair inference that Williams also shot Gilberto Garcia. But the ballistics evidence says nothing about who shot the third victim, Hector Ocasio. The ballistics evidence shows only that Ocasio was shot by a different *gun* from that used against the two Garcias. Thus the ballistic evidence does not address, one way or the other, the core question in the case, which is: Who *fired* the different gun that killed Ocasio? Reading Luis Garcia's testimony and the ballistic evidence together, one is driven to the conclusion that either Williams shot Ocasio with a second gun Williams happened to be carrying, or someone else shot Ocasio with the different gun. There is no evidence that Williams shot all three victims, and neither the government nor either defendant suggests that he did. Who played the role of the second shooter? There are two nominees. The government nominated (and charged in the indictment) Steven Camacho. Petitioners nominate Gregory Cherry (Ninja, in the parlance of the trial testimony).

These are the circumstances in which the propriety of the prosecutor's quoted summation must be judged.

I am unable to accept Petitioners' characterization of the government summation on this point as improper. Petitioners' Main Brief at 112 states accurately that the prosecutor based his "flatly contradicted" by ballistics evidence argument "on the one portion of Garcia's testimony where he stated that Tree shot him and Ninja shot the other two men." Garcia did indeed say that during his testimony; and the ballistics evidence tends to contradict the assertion, for the reason the prosecutor stated in his summation: Ninja, in order to be the shooter of both Gilberto Garcia and Ocasio, had to catch a lateral pass from Tree of the gun Tree had just used to shoot Luis Garcia. The prosecutor's argument to the jury that the defense theory of the shooters' identity was "an overreach" is fair in the circumstances, and his contention that the theory "is flatly contradicted by the ballistics expert evidence" was permissible.

Petitioners combine their interpretation of the ballistics evidence with several isolated statements or remarks culled from the record, in an effort to support the defense assertion that Luis Garcia's testimony identifies Ninja (Gregory Cherry) as the second shooter, rather than Camacho (who the defense says was home with Melendez, nowhere near the bloody scene). These assertions culminate with the criticism: "Counsels' failure to raise all of the above points that were available is inexcusable." M.B. at 115. Petitioners' arguments concerning Luis Garcia's testimony are energetically presented, but they do not establish an ineffective assistance claim. Petitioners do not satisfy either *Strickland* prong.

First: Defense counsel's performance was not deficient. In a skillful direct examination, counsel elicited Garcia's purported identification of Ninja as the second shooter. The vulnerabilities of that account were manifest. Luis Garcia had just been shot; he was severely wounded; he fell to the floor; his vision was starting to blur; Tree (who Garcia identified as the one who shot him) was

right next to Garcia, but the second shooter (who on the defense theory pursued and shot Ocasio) was some distance away from where Garcia lay. Those circumstances, which separately and in combination cast doubt upon the reliability of Garcia's identification of the second shooter, were predictably and forcefully exploited by the prosecutor during cross-examination. Defense counsel's efforts to rehabilitate his witness's account on redirect were thoroughly professional. Petitioners stress trial counsel's failure to further develop or stress in summation certain peripheral remarks which they say reinforce Garcia's direct testimony, but counsel were entitled to deference from this habeas court with respect to the manner in which counsel chose to introduce or rehabilitate exculpatory evidence, and I discern no constitutional shortcoming in the defense presentation of this aspect of the case.

Second: I am unable to conclude that if defense counsel had made all the arguments and pursued all the nuances concerning Luis Garcia's testimony that Petitioners now say they should have done, the result of the trial would have been different, which is to say, that the jury would have acquitted Camacho because he was not the second shooter. The combined effect of the testimony of government witnesses Welch and Albizu was to place Camacho on the scene of and participating in these shootings. The jury was entitled to believe those witnesses. To be sure, Luis Garcia's testimony, had the jury accepted it, would have led to a different trial result. However, as the Second Circuit succinctly stated in *Camacho I*, 187 F. App'x at 35, "a rational jury could find defense witness Luis Garcia's testimony internally contradictory, implausible, and therefore unbelievable." Those weaknesses in Garcia's identification testimony, inherent in the circumstances of these sudden and violent events, cannot be ascribed to any fault on the part of the witness in giving that evidence or defense counsel in presenting it. Petitioners do not demonstrate that, had defense counsel

comported themselves in the manners suggested by Petitioners' critique of counsel's performance, the result of the trial would have been acquittal rather than conviction.

For the reasons stated, there is nothing in this aspect of the case that justifies habeas relief for these Petitioners.

**8.      Trial Counsel's Post-Trial Conduct**

The remainder of Ground Two for the petitions, "Ineffective Assistance of Trial Counsel," is comprised of criticisms of counsel's performance during the course of Petitioners' ultimately unsuccessful post-trial efforts to vacate their convictions. M.B. at 120-31.

On this aspect of the case, Petitioners focus upon their post-trial Rule 29 and Rule 33 motions. As noted in Part I, *supra*, this Court denied Petitioners' Rule 29 motion, and initially granted their Rule 33 motion for a new trial but vacated that order on reconsideration and let the convictions stand. All this Court's post-trial rulings came to the attention of the Second Circuit on appeal, which dealt with them in *Camacho I* and *Camacho II*.

Petitioners fault their attorneys' post-trial conduct for the following specific reasons:

*        In their Rule 29 and Rule 33 motions, counsel failed to raise in this Court "all of the government's abuses in closing arguments." M.B. at 120.

*        Counsel failed to show that the government's refusal to provide Gregory Cherry with use immunity was for the improper purpose of withholding exculpatory information.

*        At the reopened new trial hearing on the government's motion for reconsideration, trial counsel "provided ineffective assistance . . . in failing to highlight government witness perjury, present available witnesses, expose the government's knowing use of perjured testimony, and seek reconsideration based on [this] Court's factual error." M.B. at 126. These contentions focus

principally upon Jose Melendez, incarcerated at the M.C.C. with Cherry, the effect of whose testimony in the Rule 33 context is discussed in Part IV.C.1., *supra*.

The mandate rule precludes these contentions as bases for habeas relief, notwithstanding their presentation in the vestments of claims for ineffective assistance. As we have seen, the substance of all these contentions were rejected on appeal in *Camacho I* or *Camacho II*. For example: the briefs for Camacho and Rodriguez on appeal includes arguments that Melendez lied and fabricated evidence during the reopened Rule 33 proceeding, and that this Court made a factual error regarding Melendez's placement in a special housing unit in crediting Melendez's testimony.[8] These contentions failed to persuade the Second Circuit on direct appeal; and, as that Court held in *Jones*, Petitioners' claims "fare no better when reframed as an ineffective assistance of counsel argument." 543 F. App'x at 71. Stripped of rhetoric, Petitioners' basic contention is that counsel should have elicited different evidence and made better arguments in connection with these several issues. That form of criticism does not sustain an ineffective assistance claim, where "[t]he question is not whether some other course would have been more successful. That can always be argued after a case has been lost. The question is whether counsel's conduct of the defense was a reasonable course at the time and came within the standards for acceptable representation." *United States v. Aguirre*, 912 F.2d 555, 563 (2d Cir. 1990). Judge Lumbard preceded those observations with a reminder that "[t]he court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id*. at 560 (citing and quoting *Strickland,* 466 U.S. 689).

The conduct of trial counsel in the post-trial proceedings does not justify habeas relief.

---

[8]   *See* citations in Government Brief [Doc. 12] at 94.

### 9. Appellate Counsel's Conduct

The petitions' Ground Three is captioned "Ineffective Assistance of Appellate Counsel." This section of Petitioners' Main Brief, M.B. at 132-44, contains ten separate specifications of perceived ineffective assistance on the part of the attorneys who represented Camacho and Rodriguez in the Second Circuit. The first nine criticisms echo, mirror or restate the particular charges of ineffective assistance previously leveled at trial counsel. The tenth specification against appellate counsel contends that in conducting the appeals in the case, counsel "provided ineffective assistance in failing to include all of the claims in Ground One herein [a due process claim based upon the government's asserted pattern of prosecutorial misconduct] as part of counsels' [presumably "prosecutors'"] pattern of prosecutorial misconduct argument." M.B. at 144. That criticism is arguably different in nature from the first nine.

With respect to the first nine claims of ineffective assistance on the part of appellate counsel, Petitioners' theory appears to be that trial counsel committed ineffective assistance in the district court by what they had done or left undone during the trial, and appellate counsel share that sinful state by failing to seek corrective remedies in the court of appeals. There is no substance to this contention. For the reasons stated *supra*, I conclude that Petitioners have no viable claim that trial counsel's conduct of the case amounted to ineffective assistance. It follows that these derivative ineffective assistance claims against appellate counsel fail *a fortiori*.

Petitioners' tenth ineffective assistance criticism of appellate counsel proceeds from their contention that the prosecutors engaged in a pattern of prosecutorial misconduct which violated Petitioners' Fifth Amendment due process rights. Ground One of the petitions lists a number of specific instances occurring during the trial which Petitioners say violated due process. In their

critique of appellate counsel, Petitioners say that counsel "raised a Pattern of Prosecutorial Misconduct argument raising only three points related to those in Ground One," a selective approach Petitioners fault by reasoning: "Because this was a 'pattern' of misconduct argument, and all of the issues raised ante at Ground One, with the exception of Part (I), were available to counsel on appeal, the absence of the issues constituted ineffective assistance. There was absolutely no strategic reason for counsel to fail to include the clearly powerful issues in Ground One as part of this pattern of misconduct argument." M.B. at 144-45.

I defer further consideration of this particular appellate ineffective assistance claim to the discussion in Part V of this Ruling, which deals principally with the due process aspects of these petitions.

## V.  PETITIONERS' DUE PROCESS CLAIMS

Ground One of these habeas petitions is comprised of a collection of acts or omissions of the government prosecutors which occurred during the course of the case. Petitioners contend that each incident violated their Fifth Amendment due process rights.

While Petitioners' briefs vigorously press those particularized contentions, M.B. at 12-75, the main thrust of Ground One is that the prosecutors' acts and omissions should be viewed together as constituting "a pattern of prosecutorial misconduct." Petitioners sum up this perception at M.B. at 75 by saying: "the government not only committed individual acts of misconduct . . . , but acted with deliberateness in a pattern of prosecutorial misconduct, beginning pre-trial and continuing throughout the trial, post[-]trial motions and appeal, infecting the integrity of the proceeding. . . . Every improper act committed by the government was calculated to produce and keep in place a

wrongful conviction, i.e., a fundamental miscarriage of justice in the convictions of two men who are actually innocent of the charged crimes." (citations and internal quotation marks omitted). Petitioners support these assertions with the partial quotation of a footnote appearing in *Brecht v. Abrahamson*, 507 U.S. 619, 638 n. 9 (1993). That footnote reads in its entirety:

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. We, of course, are not presented with such a situation here.

507 U.S. at 638 n. 9 (citation omitted) The Court's holding in *Brecht* rejected a state prisoner's habeas claim.

In this Part V of the Ruling, I consider Petitioners' due process claims independently of, and without regard to, Petitioners' ineffective assistance of counsel claims, which are dealt with in Part IV. This Part gives further consideration to the effect upon the due process claims of the mandate rule and the procedural default rule. To a large measure, the due process claims echo, mirror and restate the facts and circumstances giving rise to the ineffective assistance claims.

Some of the asserted prosecutorial improprieties collected in Ground One of the petitions were raised as grounds for direct appeal and rejected by the Second Circuit. The mandate rule bars such claims from habeas consideration; the preclusion is absolute, without hope of salvage or redemption. Asserted due process violations which were not raised on appeal are subject to habeas preclusion by the procedural default rule. As to such claims, Petitioners make two arguments intended to avoid preclusion. I will call these arguments the "Actual Innocence" theory and the "Pattern of Prosecutorial Misconduct" theory, and discuss them separately.

**A.     Actual Innocence**

Camacho and Rodriguez have always proclaimed their total innocence of the crimes of violence for which the jury convicted them.  They asserted that innocence throughout the trial, during the post-trial motions and appeals, and do so today: The Joint Main Brief for Camacho and Rodriguez on the present habeas petitions begins with the ringing declaration that "Petitioners' motions seek to remedy a fundamental miscarriage of justice, i.e., to reverse the convictions of two men who are actually innocent of the charged crimes."  M.B. at 1.

This habeas Court acknowledges and respects the protestations of innocence from which Camacho and Rodriguez have neither retreated nor wavered.  But decisions of the Supreme Court and the Second Circuit, by which this Court is bound, prelude any reliance in the habeas context by Camacho or Rodriguez on the doctrine of actual innocence.  The governing rule of law is that a habeas petitioner, seeking to avoid limitations on habeas relief by claiming that he was actually innocent of the crime of conviction, must show that his claim of actual innocence is credible and compelling, and do so by means of *new evidence* that was not available or introduced at trial.  The requirement of new evidence is fatal to the effort of Camacho and Rodriguez to bolster their habeas petitions with claims of actual innocence.  That is because Petitioners' varied and voluminous assertions of misconduct or inadequacies on the part of prosecutors or defense attorneys (trial and appellate) all arise directly from or are related to events occurring, or evidence admitted, at the trial, post-trial hearings, or the appeals.  Petitioners revisit many aspects of the earlier litigation, but submit no new evidence in support of the present habeas motions.

In *Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004), Circuit Judge Sotomayor (as she then was) observed: "The doctrine of actual innocence was developed to mitigate the potential harshness of the

judicial limitations placed on a petitioner's ability to file successive or otherwise procedurally defaulted habeas petitions in the federal courts." 391 F.3d at 160. For that proposition Judge Sotomayor cited *Schlup v. Delo*, 513 U.S. 298, 318-21 (1995), which *Doe* summarized as "describing development of limitations on the writ of habeas corpus and establishing contours of actual innocence exception." *Id*. Expanding upon the "actual innocence exception," the Second Circuit said in *Doe v. Menefee*:

> An independent category of cases in which petitioners may suffer miscarriages of justice if they are procedurally barred from filing habeas petitions is composed of those cases in which the petitioners claim that they are actually innocent of the crimes for which they were convicted. Thus, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default. . . . Accordingly, a petitioner may use his claim of actual innocence as a "gateway," or a means of excusing his procedural default, that enables him to obtain review of his constitutional challenges to his conviction.

391 F.3d at 160-62 (citations and some internal quotation marks omitted). The *Doe* opinion also stresses the limitations the Supreme Court fashioned in *Schlup* on the actual innocence exception:

> The *Schlup* Court carefully limited the type of evidence on which an actual innocence claim may be based and crafted a demanding standard that petitioners must meet in order to take advantage of the gateway. The petitioner must support his claim "with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – *that was not presented at trial*." [citing *Schlup*, 513 U.S. at 324]. Because *Schlup* explicitly states that the proffered evidence must be reliable, the habeas court must determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record. [citing *Schlup*, 513 U.S. at 327-28].

391 F.3d at 161 (emphasis added).

84

*Rivas v. Fischer*, 687 F.3d 514 (2d Cir. 2012), furnishes a recent example of the sort of new evidence sufficient to qualify a habeas petitioner for the actual innocence exception. Rivas had been convicted following a state court jury trial of second-degree murder. He filed a habeas petition in federal court under 28 U.S.C. § 2254. That petition was untimely under the one-year limitations imposed by the AEDPA, 28 U.S.C. § 2244(d). The Second Circuit held, in a case of first impression, that the actual innocence gateway operated to excuse Rivas from the preclusive effect of the AEDPA limitation period. Judge Cabranes's opinion describes the manner in which Rivas advanced a sufficient claim of actual innocence:

> Rivas has raised a credible and compelling claim of actual innocence, as those concepts are understood in the relevant habeas jurisprudence. His claim is based on new information not presented to the jury that dramatically undermines the central forensic evidence linking him to the crime of which he was convicted. In sum and substance, Rivas has shown, through the essentially unchallenged testimony of a respected forensic pathologist, that the victim was almost certainly killed at a time when Rivas had an uncontested alibi, and not earlier, as the prosecution had contended at his trial.

687 F.3d at 517-18. After an extensive review of the trial evidence, the Second Circuit remanded *Rivas* to the district court for a full evaluation of the merits of the petitioner's constitutional habeas claims. The Second Circuit reasoned that "[a]pplying the *Schlup* standard . . . we conclude that it is more likely than not, in light of the credible *new evidence* Rivas has presented in support of his habeas petition, that any reasonable juror would have had a reasonable doubt about his guilt." *Id.* at 543 (emphasis added).

Since Camacho and Rodriguez present no new evidence in support of their habeas petitions, the actual innocence exception is not available to them, and can play no part in the analysis of their entitlement to habeas relief. It follows that the merits of these habeas petitions must be evaluated

within the contexts of the procedural default rule and the mandate rule.

**B.      Pattern of Prosecutorial Misconduct**

The able (albeit anonymous) authors of Petitioners' briefs are aware of the preclusive effects of the procedural default and mandate rules upon these habeas collateral attacks upon the convictions of Camacho and Rodriguez.   The briefs seek to avoid the bars upon the particular claims by gathering them together under a single caption, delineated a "pattern of prosecutorial misconduct," and viewing that artifact as the cause of a constitutional violation.   Thus the Main Brief at 1 asserts as the first of three "General grounds for relief":    "The Government's Pattern of Prosecutorial Misconduct Violated Petitioners['] Fifth Amendment due Process Rights."   Petitioners seek by this arrangement to sidestep the rules of law that would  preclude their claims if considered separately. That purpose is expressed most clearly in Petitioners' Reply Brief at 1-2, where it is said:

> The government's Opposition to petitioners' due process/government misconduct claim argues that many of the individual lettered subsection issues are barred for either failure to raise the claim in direct review or because the issue was already litigated.   The government misses the fact that these individual issues, whether previously litigated or not, are also each part of a claim of a <u>pattern</u> of prosecutorial misconduct that violated Petitioners' due process rights.  This continued pattern of misconduct and lack of respect for the rule of law was so egregious that the proceedings cannot be found to have produced a just result with the conviction of two men for murders they did not commit.  Thus, petitioners' due process claim is cognizable in § 2255 proceedings because it amounts to a fundamental miscarriage of justice.

Petitioners repeat their protestation of actual innocence.   They do not rely upon any new evidence, a circumstance that under the cited cases militates against a claim of innocence as a basis for collateral attack upon the convictions.   Quite apart from that principle, petitioners cite no authority for the unspoken proposition upon which their case for collateral relief depends.

Petitioners contend, in effect, that a number of due process or government misconduct claims, each barred *separately* by appellate decisions from consideration by a district court in a habeas proceeding, may nonetheless be considered *together* by the habeas court and produce the cumulative result of an unconstitutional miscarriage of justice entitling a habeas petitioner to collateral relief. Petitioners cite no decision supporting that proposition. The only cases they cite in the pertinent section of their reply brief are *Bousley v. United States*, 523 U.S. 614, 622 (1998) (quoting *Murray v. Carrier*, 477 U.S. 478, 485, 496 (1986)); *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); and *Spence v. Great Meadows Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000).While those decisions articulate a number of important propositions and principles, it requires imaginative reading to discern in them what Petitioners purport to find.

*Murray* and *Bousley* were referred to earlier in this Ruling, but given the prominence Petitioners give them, together with *Coleman*, in their reply brief as authority for what I will call Petitioners' "cumulative effect" claim, these three Supreme Court decisions will be considered further, in reverse chronological order, beginning with the earliest decision.

In *Murray*, the first of the cases, a state court defendant and federal habeas petitioner was convicted of rape and abduction by a state court jury. The state trial judge had refused defendant's motion to discover the victim's pre-trial statements. Defendant's state court attorney regarded that refusal as erroneous, but failed to include it as a claim of error among the other grounds for appeal presented to the state supreme court, with the result that the claim relating to the victim's statements was procedurally defaulted under state law. After state court appeals and petitions failed, defendant filed a federal habeas petition, which ran up against the United States Supreme Court's holding that "a federal habeas petitioner who has failed to comply with a State's contemporaneous-objection rule

at trial must show cause for the procedural default and prejudice attributable thereto in order to obtain review of his defaulted constitutional claim." *Murray*, 477 U.S. at 485 (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). The district court denied the writ, holding "the discovery claim barred by the procedural default and indicating that respondent should establish cause for that default in state courts." 477 U.S. at 483. A divided Fourth Circuit reversed, the majority holding that "in order to establish cause a federal habeas petitioner need only satisfy the district court that the failure to object or to appeal his claim was the product of his attorney's ignorance or oversight, not a deliberate tactic," and remanding the case to the district court because "[t]he question of counsel's motivation is one of fact for the district court to resolve upon taking further evidence." *Id*. at 484 (internal quotation marks omitted).

The Supreme Court reversed the Fourth Circuit. Justice O'Connor's opinion posed the question to be "whether a federal habeas petitioner can show cause for a procedural default by establishing that competent defense counsel inadvertently failed to raise the substantive claim of error rather than deliberately withholding it for tactical reasons." 477 U.S. at 481-82. The Court answered that question in the negative. Justice O'Connor construed the petitioner's argument as asking the Supreme Court "to affirm the Court of Appeals' judgment on the narrow ground that even if counsel's ignorance or inadvertence does not constitute cause for a procedural default at trial, it does constitute cause for a procedural default on appeal." *Id*. at 490. The Court rejected that distinction; *Murray* holds that "the cause and prejudice test applies to defaults on appeal as to those at trial." *Id.* at 491.

In consequence, the Fourth Circuit's judgment was reversed, but the case was remanded for further proceedings to allow the lower courts to address an alternative basis for habeas relief

identified in Justice O'Connor's opinion:

> [I]n appropriate cases the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration. . . . . Accordingly, we think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."

*Id.* at 495-96 (citation and internal quotation marks omitted). *Murray* concludes with this holding and direction:

> Respondent's petition for federal habeas review of his procedurally defaulted discovery claim must therefore be dismissed for failure to establish cause for the default, unless it is determined on remand that the victim's statements contain material that would establish respondent's *actual innocence*.

*Id*. at 498 (emphasis added).

The next Supreme Court case Petitioners cite in support of their "cumulative effect" contention is *Coleman v. Thompson*, 501 U.S. 722 (1991). Coleman, the federal habeas petitioner, had been convicted of rape and capital murder by a Virginia state court jury and sentenced to death. The Virginia Supreme Court affirmed both the convictions and the sentence. A Virginia lower court denied Coleman's state habeas petition, which raised numerous federal constitutional claims he had not raised on direct appeal. Coleman's attorney did not file a notice of appeal from that denial until 33 days after entry of final judgment. The Virginia Supreme Court granted the State's motion to dismiss the appeal on the ground that a state statute provided no appeal would be allowed unless a notice of appeal was filed with the trial court within 30 days of final judgment. Coleman then filed a federal habeas petition, which the district court denied. The Fourth Circuit affirmed that denial, reasoning that Coleman's claims for federal habeas relief had been procedurally defaulted and he

"had not shown cause to excuse the default." 501 U.S. at 730. The Supreme Court granted certiorari "to resolve several issues concerning the relationship between state procedural defaults and federal habeas review, and now affirm." *Id*.

Justice O'Connor's comprehensive review in *Coleman* of Supreme Court decisions includes references to *Murray v. Carrier*.[9] *Coleman* quotes the holding in *Murray* that "[w]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." 501 U.S. at 748 (quoting *Murray*, 477 U.S. at 496). However, the Court continued in *Coleman,* "in *Carrier* . . . we left open the question whether *Fay*'s[10] deliberate bypass standard continued to apply under the facts of that case, where a state prisoner has defaulted his entire appeal." *Id*. at 750 (citing *Murray*, 477 U.S. at 492). Expanding on that issue, the Court said in *Coleman*:

> We are now required to answer this question. By filing late, Coleman defaulted his entire state collateral appeal. This was no doubt an inadvertent error, and respondent concedes that Coleman did not "understandingly and knowingly" forgo the privilege of state collateral appeal. (citing and quoting *Fay*, 372 U.S. at 439). Therefore, if the *Fay* deliberate bypass standard still applies, Coleman's state procedural default will not bar federal habeas.

*Id. Coleman* answers that question thus:

> We now make it explicit: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the

---

[9] Justice O'Connor's opinion in *Coleman* refers to that earlier case as "*Carrier*." Subsequently, Chief Judge Rehnquist's opinion in *Bousley*, discussed *infra*, calls the case "*Murray*." Presented with this choice, I will during the course of this Ruling refer to the case as *Murray*.

[10] *Fay v. Noia*, 372 U.S. 391 (1963).

> claims is barred unless the prisoner can demonstrate cause for the
> default and actual prejudice as a result of the alleged violation of
> federal law, or demonstrate that failure to consider the claims will
> result in a fundamental miscarriage of justice.

501 U.S. at 750. *Murray v. Carrier* is given the broadest possible reading: the Court says in *Coleman* that "*Carrier* applied the cause and prejudice standard to the failure to raise a particular claim on appeal. There is no reason that the same standard should not apply to a failure to appeal at all." *Id*.

The Court's final holding in *Coleman* was that the petitioner's invocation of attorney error availed him nothing. "Applying the *Carrier* rule as stated," Justice O'Connor stated tersely, "this case is at an end. There is no constitutional right to an attorney in state post-conviction proceedings." *Id*. at 752 (citations omitted). *Coleman* emphatically came to an end with the concluding paragraphs of the Court's opinion:

> Given that a criminal defendant has no right to counsel beyond his
> first appeal in pursuing state discretionary or collateral review, it
> would defy logic for us to hold that Coleman had a right to counsel
> to appeal a state collateral determination of his claims of trial error.
>
> Because Coleman had no right to counsel to pursue his appeal in
> state habeas, any attorney error that led to the default of Coleman's
> claims in state court cannot constitute cause to excuse the default in
> federal habeas. As Coleman does not argue in this Court that federal
> review of his claims is necessary to prevent a fundamental
> miscarriage of justice, he is barred from bringing these claims in
> federal habeas.

*Id*. at 756-57. We know from other cases what the Court means by "a fundamental miscarriage of justice." In the habeas context, it is the conviction of a defendant whose *actual* innocence is demonstrated by reliable *new evidence* not presented at trial.

The Court cited and applied *Murray v. Carrier* during the course of its opinion in *Bousley*,

the third and most recent Supreme Court case cited by Petitioners. The federal habeas petitioner in *Bousley* had pleaded guilty in a federal district court to the separate crimes that he possessed a controlled substance with intent to distribute, and that he "used firearms during and in relation to a drug trafficking crime," the latter in violation of 18 U.S.C. § 924(c). The district court sentenced petitioner on the basis of his plea. In 1991, "Petitioner appealed his sentence, but did not challenge the validity of his plea." 523 U.S. at 617. The Eighth Circuit affirmed the sentence. In 1994, petitioner sought a writ of habeas corpus, challenging the factual basis for his guilty plea on the gun charge on the ground that "neither the evidence nor the plea allocution showed a connection between the firearms in the bedroom of the house, and the garage, where the drug trafficking occurred." *Id*. The district court dismissed the habeas petition, concluding that "there was a factual basis for petitioner's guilty plea because the guns in petitioner's bedroom were in close proximity to drugs and were readily accessible." *Id*. Petitioner appealed. While that appeal was pending, the Supreme Court decided the unrelated case of *Bailey v. United States*, 516 U.S. 137 (1995), which held that "a conviction for use of a firearm under § 924(c) requires the Government to show active employment of the firearm" and "a defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds, or for placement of a firearm to provide a sense of security or to embolden." *Bousley*, 523 U.S. at 617 (citations to *Bailey* and internal quotation marks omitted). Counsel for Bousley called the Eighth Circuit's attention to *Bailey*, as a ground for vacating the petitioner's plea of guilty to the gun count, but the Court of Appeals, unmoved by the Supreme Court's decision in *Bailey*, affirmed the dismissal of the habeas petition in *Bousley*.

The Supreme Court granted certiorari in *Bousley* and reversed the Eighth Circuit, remanding the case with instructions. Chief Justice Rehnquist's opinion began by holding that "petitioner

contested his sentence on appeal, but did not challenge the validity of his plea. In failing to do so, petitioner procedurally defaulted the claim he now presses on us." 523 U.S. at 621. But that was not the end of the case: the *Bousley* Court went on to say:

> Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice," or that he is "actually innocent."

*Id*. at 622 (internal citations omitted). *Murray v. Carrier* is the first authority *Bousley* cites for those propositions, and the source of the internal quotations.

Applying these principles to the circumstances presented by *Bousley,* the Court held: "Petitioner's claim may still be reviewed in this collateral proceeding if he can establish that the constitutional error in his plea colloquy 'has probably resulted in the conviction of one who is actually innocent.'" 523 U.S. at 623 (again citing and quoting *Murray*), to which the Court added that "[t]o establish actual innocence, petitioner must demonstrate that, 'in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Id.* (citing and quoting *Schlup v. Delo*, 513 U.S. at 327-28). The Court decided *Bousley* by concluding:

> In this case, the Government maintains that petitioner must demonstrate that he is actually innocent of both "using" and "carrying" a firearm in violation of § 924(c)(1). But petitioner's indictment charged him only with "using" firearms in violation of § 924(c)(1). App. 5-6. And there is no record evidence that the Government elected not to charge petitioner with "carrying" a firearm in exchange for his plea of guilty. Accordingly, petitioner need demonstrate no more than that he did not "use" a firearm as that term is defined in Bailey.

> If, on remand, petitioner can make that showing, he will then be entitled to have his defaulted claim of an unintelligent plea considered on its merits. The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings

consistent with this opinion.

523 U.S. at 624.

It is apparent from this analysis that the three Supreme Court cases cited in their reply brief do not support, separately or in combination, the "cumulative effect" theory Petitioners offer as a basis for habeas relief. Petitioners extract from the opinions in *Murray*, *Coleman* and *Bousley* declarations that constitutional law does not favor the fundamental miscarriage of justice inherent in the conviction of an innocent individual. Select quotation is a recognized form of advocacy, but the holdings of these cases militate against habeas relief for Camacho and Rodriguez, rather than supporting it. *Murray*, *Coleman* and *Bousley*, read together with *Schlup* and the Second Circuit's opinion in *Doe v. Menefee*, instruct federal district courts that a defendant's unexcused procedural defaults during trial or on appeal bar subsequent habeas relief unless the habeas petitioner proffers reliable new evidence, not presented at trial, of his actual innocence: showings that Camacho and Rodriguez do not attempt.

In support of their cumulative effect theory, Petitioners also cite the Second Circuit's decision in *Spence v. Superintendant, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000). The atypical facts in *Spence* led the Second Circuit to discern a federal habeas petitioner's actual innocence of an underlying state crime, in circumstances which excused his state court procedural default and justified federal habeas relief. Spence, a youthful man. pleaded guilty to a robbery charge in a New York State trial court. The trial judge explained to Spence that "if he successfully complied with a one-year period of supervision, he would be put on probation and probably be granted youthful offender treatment," but that "if he failed to abide by the conditions set at the acceptance of his plea, he would be sentenced to imprisonment for a term of eight and one-third to

94

25 years." 219 F.3d at 166. During the sentencing hearing, the state trial judge said to Spence: "If you get rearrested . . . I'm going to sentence you up to the maximum time allowed by law – again, it's eight and a third to 25." *Id.* at 167.

When the Second Circuit came to consider the case on federal habeas years later,[11] Judge Cardamone's opinion concluded initially that "the [state] court's instruction to Spence was ambiguous, and susceptible to two meanings":

> Spence would violate the terms of his probation simply by being rearrested; or, Spence would violate probation only if he committed some wrongful act within his control. That is to say, the plea agreement could be understood either as a "no arrest" or as a "no misconduct" agreement.

*Id.* While "the district court and state courts that considered this matter concluded that it was a no arrest agreement," the Second Circuit held as a matter of law that "it was a no misconduct agreement," *id.*, and parsed the parties' rights and obligations accordingly. *Id.* The distinction between meanings made a decisive difference, because during the one-year probation period, Spence was again arrested, for a new robbery. He pleaded not guilty to that charge, went to trial, and was acquitted. Notwithstanding those circumstances, the state prosecutors and courts adhered to the position that Spence's *arrest* on the new charge triggered the enhanced sentence on the charge to which he had pleaded, even though the state had no basis to contend that Spence had violated a "no misconduct" agreement.

Spence's core claim was that the state prosecutors and courts erred in construing the plea agreement as a "no arrest" agreement. It was, in Spence's submission, a "no misconduct" agreement

---

[11] Spence's plea proceeding took place before the state court trial judge on September 30, 1992. The Second Circuit heard argument on the district court's denial of federal habeas on February 8, 1999, and filed its opinion reversing that denial on July 18, 2000.

– as the Second Circuit ultimately held – and accordingly, Spence was not subject to the plea agreement's enhanced sentence "simply by being rearrested" on the new and unrelated charge. Spence's eventual petition for federal habeas corpus review, asserting this claim, was complicated by the fact that his appeal to the state court of appeals asserting that claim was denied as not timely filed. In that circumstance, the Second Circuit noted: "Because Spence failed to raise his claim in the ordinary appellate process and can now no longer do so, it is procedurally defaulted." 219 F.3d at 170.

The Second Circuit held in *Spence* that, given the particular and unusual facts of the case, the petitioner's *actual innocence* of the charged new robbery excused his procedural default in asserting that claim in the state courts. Judge Cardamone's opinion began the analysis of that question by saying:

> The doctrine of procedural default is based on considerations of comity and finality, and not on a jurisdictional limitation on the power of a federal court under 28 U.S.C. § 2254 to look beyond a state procedural default and consider the merits of a defaulted claim that asserts a constitutional violation. *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986). But procedural default in state court will bar federal habeas review unless the petitioner can either: (1) show cause for the default and actual prejudice as a result of the constitutional violation, *or* (2) demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, or, in other words, an unjust incarceration. *See Murray*, 477 U.S. at 496.

219 F.3d at 170 (emphasis in original) (lateral citations and additional citation omitted). *Spence*'s continuing quotation from *Murray* includes the language that "an extraordinary case" justifying habeas relief "even in the absence of a showing of cause for the procedural default" occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent."

*Id.*

These Supreme Court decisions have coined two synonymous phrases: the "miscarriage of justice" and "actual innocence" exception to the procedural default doctrine. The Second Circuit in *Spence* used both phrases interchangeably on the same page ( 219 F.3d at 170), in succeeding paragraphs. Building upon *Murray* and *Coleman*, the Second Circuit held in *Spence*: "Excusing Spence's procedural default and reaching his constitutional claim is fully consonant with the narrow scope of the miscarriage of justice exception," a concept the opinion explains by saying:

> In Spence's case, the constitutional error pertains to the fact that he was actually innocent of breaching the no misconduct condition in his plea agreement – the same breach that the trial judge used as the predicate for his incarceration. By challenging the determination of his responsibility for the act predicating his enhanced sentence, Spence raises precisely the question that the actual innocence exception contemplates.

219 F.3d at 171. The Second Circuit concluded that "in these circumstances, the actual innocence exception applies to the sentencing phrase of a noncapital trial." *Id.* Having resolved that preliminary issue, the Second Circuit continued in *Spence:*

> [O]ur inquiry is then whether, by clear and convincing evidence, defendant has shown that he is actually innocent of the act on which his harsher sentence was based. Where a petitioner shows by clear and convincing proof that he is actually innocent of the conduct on which his sentence is based, the incarceration is fundamentally unjust and the miscarriage of justice exception to the procedural default bar applies.

*Id.* at 172 (citations omitted).

The Second Circuit conducted that inquiry by examining evidence relating to "the act on which [Spence's] harsher sentence was based" – the second, subsequent robbery, of which Spence consistently maintained his innocence. *Id.* The evidence included Spence's grand jury testimony "in

which he denied any involvement in the second crime"; trial testimony "from five reputable alibi witnesses who confirmed his claim that he had been at home with family and friends at the time the crime was committed"; the arresting officer's admission at trial that "one of the two victims could not identify Spence either from photographs or in a lineup"; "[t]he one victim who did identify Spence was reputedly a drug addict and perhaps unreliable as a witness"; and "it was clear that the arresting officer knew prior to arresting him of Spence's plea agreement and that another arrest would enhance his sentence for the first conviction." *Id.* The court of appeals concluded its recitation of that cornucopia of exculpatory evidence with the trenchant observation: "And, of course, the jury that heard Spence's case acquitted him." *Id.* Judge Cardamone's opinion proceeds inexorably to its final conclusion:

> This evidence clearly and convincingly demonstrates that no reasonable finder of fact could have determined that Spence committed a criminal act in violation of his plea agreement that would have made him eligible for a harsher sentence. We conclude therefore that Spence was actually innocent of the act for which he received an enhanced sentence. Such a manifest injustice brings petitioner within the fundamental miscarriage of justice exception.

*Id.* (footnote omitted). The Second Circuit held that "essential fairness mandates specific performance of the sentence Spence bargained for," and directed the district court "to grant Spence's petition for a writ of habeas corpus and to order his release from prison." *Id.* at 175.

The disinterested reader may wonder at the State of New York's intransigence in clinging to an enhanced sentence in the face of this evidence of Spence's actual innocence, and applaud the Second Circuit for preventing so fundamental a miscarriage of justice. However, nothing in the holdings or rationale of the *Spence* opinion lends any support to the present Petitioners' fall-back contention: that habeas claims, barred by one or the other of the two preclusion rules (mandate rule

and procedural default), may nonetheless be considered together and result in the cumulative effect of a constitutional violation justifying habeas relief.

Petitioners do not call to my attention any case supporting that proposition. The Supreme Court trilogy they cite in their reply brief does not do so, read separately or together; neither does *Spence* in the Second Circuit. The Court's research does not reveal any appellate decisions upon which such a principle may be rested. One district court in this circuit squarely rejects the concept: *Amato v. United States*, No. 11-cv-5355 (NGG), 2017 WL 1293801 (E.D.N.Y. April 6, 2017). Amato, the habeas petitioner, and two other defendants were convicted after a six-week jury trial on all counts of a RICO criminal indictment alleging several crimes in connection with the activities of the Bonanno crime family. The Second Circuit affirmed Amato's conviction on direct appeal. Amato then filed a habeas petition under 28 U.S.C. § 2255, which was assigned to the trial judge, District Judge Garaufis, who noted that "Petitioner's factual recitations and legal analysis are scattered across 12 documents that collectively total over 200 pages, even before accounting for Petitioner's many exhibits." 2017 WL 1293801, at *11 (footnote omitted).

Confronted with this wealth of material, Judge Garaufis said at the outset: "In the interest of analytic efficiency, the court groups Petitioner's claims in the following four categories." *Id.,* at *10. The four categories are: "Ineffective assistance of counsel"; "Two additional claims asserted for the first time on collateral review"; "The same five claims rejected by the Second Circuit on direct appeal"; and "A catch-all claim that Petitioner was denied his constitutional rights 'by the cumulative effect' of these errors." *Id.*, at *10-*11. This is the sort of "catch-all claim" Camacho and Rodriguez put forward in the case at bar, particularly in their reply brief.

Judge Garaufis began his comprehensive habeas opinion by reviewing "two procedural bars

that preclude certain federal habeas claims," *id.*, at *9, these being the mandate rule identified by the Second Circuit in *Yick Man Mui v. United States*, 614 F.3d 50 (2d Cir. 2010), and the procedural default rule, defined by the Supreme Court in *Massaro v. United States*, 538 U.S. 500, 504 (2003), as barring habeas consideration of "claims not raised on direct appeal."[12] However, Judge Garaufis considered the first category, Amato's ineffective assistance of counsel claims, on their merits, since he properly recognized that the procedural default bar "does not apply to claims of ineffective assistance of counsel," 2017 WL 1293801 at *10. The court rejected the ineffective assistance claims for lack of merit. Judge Garaufis held that the second category of claims, asserted for the first time on collateral review, were precluded by the procedural default rule. *Id.* at *29. He held that the third category, claims already resolved on direct appeal, were precluded by the mandate rule. *Id.* at *30-31.

That left Judge Garaufis with what he termed Amato's "cumulative effect" claim, which the court rejected in short order:

> Petitioner alleges that he was denied his Fifth and Sixth Amendment rights "by the cumulative effect of the errors in this case." The court has not found evidence of any constitutional error. Moreover, Petitioner has failed to cite any legal authority in support of his "cumulative effect" claim. This claim is dismissed.

2017 WL 1293801, at *31.

The briefs for Camacho and Rodriguez are equally deficient in their citation of authority supporting a cumulative effect claim in the circumstances of this case. What this case comes down to is these Petitioners' insistence that claims of error or misconduct, which if considered separately

---

[12] *Yick Man Mui* and *Massaro*, together with other pertinent cases, are also discussed in this Ruling *supra.*

would be precluded from consideration as a ground for collateral attack, may be considered together and produce a cumulative effect which justifies collateral relief. Not only does Second Circuit authority fail to support this cumulative effect theory, its jurisprudence points in a contrary direction.

*Yick Man Mui*, 614 F.3d 50, is the leading Circuit case on bars to collateral review of criminal convictions. Judge Winter began the Second Circuit's opinion with a statement of unmistakable judicial policy:

> Prisoners may seek collateral review of a federal conviction or sentence that was "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.

614 F.3d at 53 (citations and internal quotation marks omitted). Given that prophylactic policy, it is difficult to imagine the Second Circuit would be receptive to an argument that separate violations of rules intended to make it more difficult to upset a conviction by collateral attack may, without altering the rules' preclusive purpose, be accumulated in such a manner as to make collateral attack less difficult.

While this Court appreciates the sincerity and skill with which Petitioners assert their cumulative effect claim, I am unable to accept it. Accordingly, I hold that claims barred by the mandate rule or by the procedural default rule cannot form the basis for habeas relief, whether those claims are viewed separately or in combination.

## C. Appellate Counsel and the Pattern of Prosecutorial Misconduct Theory

I come now to the last claim of ineffective assistance by appellate counsel that Petitioners assert among the numerous claims under that heading. This particular claim is that while appellate

counsel raised on appeal certain assertions of prosecutorial misconduct, other claims of that nature were not included. Petitioners' habeas theory is that those omissions by counsel lessened the prospects of demonstrating a *pattern* of misconduct to the court of appeals.

That theory is contrary to Supreme Court authority. The Court considered the nature of ineffective assistance by appellate counsel in *Smith v. Robbins*, 528 U.S. 259 (2000). *Smith* deals with the extent to which appellate counsel may, consistent with a defendant's constitutional right to the assistance of counsel on appeal, choose between claims to raise on appeal or not raise. Justice Thomas wrote for the majority: "In *Jones v. Barnes*, 463 U.S. 745 (1983), we held that appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." 528 U.S. at 288. "Notwithstanding *Barnes*," the *Smith* opinion continued, "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id.* In that regard, the *Smith* Court cited and quoted with approval the Seventh Circuit's opinion in *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986): "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance be overcome." *Smith*, 528 U.S. at 288.

In the case at bar, this particular claim of ineffective assistance by appellate counsel fails for two reasons. First, as noted in Part V.B., the concept of a pattern of prosecutorial misconduct finds limited, if any, support in the cases. Second, appellate counsel's selections of the claims to be included in the direct appeals were presumptively permissible choices in an effort to maximize success on appeal, and cannot form the basis of a habeas claim. While the appeals did not succeed, an attorney's lack of litigation success may not be equated with his or her professional incompetence.

Deficient conduct amounting to professional incompetence has not been shown in this case.

## VI.  CONCLUSION

For the reasons stated in this Ruling, I conclude that neither Camacho nor Rodriguez has demonstrated an entitlement to habeas corpus relief .  Their petitions will accordingly be DENIED.

It is likely that Camacho and Rodriguez will not agree with the Court's reasoning, or approve of the principles of law by which this trial court is bound.  Camacho and Rodriguez, convicted by a jury and their appeals rejected, are serving long sentences.  The Constitution promised these two young men the effective assistance of counsel.  It is likely they hoped, perhaps even believed,  that the rendition by counsel of *effective* assistance would result in acquittals, so that the convictions reveal the ineffectiveness of the assistance.  In human terms, one can sympathize with such a reaction; but the rule of law is harder, more demanding.  A Supreme Court decision like *Strickland* and its progeny lay down strict boundaries which must be crossed before a court may vacate a criminal conviction on a writ of habeas corpus.  There are public, social and legal reasons for those restrictive boundaries.  Camacho and Rodriguez may be forgiven if they reject those reasons utterly.  This Court is bound by them.

I have considered all of Petitioners' contentions, whether or not they are discussed at length in this Ruling.  Upon full consideration, I am unable to discern in this case any ground upon which either Camacho or Rodriguez are entitled to habeas corpus relief.  Accordingly, and for the foregoing reasons:

1.  The Petition of Jaime Rodriguez for a writ of Habeas Corpus, No. 14 Civ. 4628, is DENIED and the Petition is DISMISSED.

2. The Petition of Steven Camacho for a writ of habeas corpus, No. 14 Civ. 4846, is

DENIED and the Petition is DISMISSED.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         December 13, 2017


CHARLES S. HAIGHT, JR.
Senior United States District Judge